**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| LYLE DOTSON AND OLON DOTSON, | * | NUMBER: |
| Plaintiffs, | * | |
| | * | |
| v. | * | SECTION: |
| | * | |
| COL. MICHAEL EDMONSON, CAPT. | * | JUDGE: |
| DONOVAN ARCHOTE, TROOPER | * | |
| HUEY MCCARTNEY, TROOPER | * | MAGISTRATE |
| CALVIN ANDERSON, TROOPER | * | |
| TAGEE JOURNEE, TROOPER RENE | * | |
| BODET, each in their individual capacities. | * | |
| Defendants. | * | |
| _____ | * | |

# <u>COMPLAINT</u>

The Louisiana State Police ("LSP") has contracted with the City of New Orleans for the stated purpose of protecting the safety of residents and visitors in the French Quarter by enforcement of the law. But as teenager Lyle Dotson and his father, Professor Olon Dotson, learned to their regret, the State Police engage in a pattern and practice of aggressive, unjustified harassment of African-Americans in the City of New Orleans, including the detention and arrest of African-Americans without probable cause and the use of excessive and unjustified force against them. This civil action seeks redress for the injuries, which Lyle and Olon Dotson suffered when the Louisiana State Police chose to violate the law rather than enforce it.

Lyle is a thoughtful, reserved young man whose principal activities in high school included the Chess Club and the Latin Club. Before October 7, 2015, he had never been arrested, never been in a jail, and had never been a defendant in a criminal case. On that

1

date, Lyle was with his father, Olon Dotson, a professor of architecture at Ball State University. Professor Dotson was leading his architecture class on an extended field trip through the southern United States. The itinerary included stops at key civil rights sites, volunteer opportunities, and viewing the unique and historic architecture of New Orleans, particularly the French Quarter.

During the class' stop in the French Quarter to view the architecture of the interior courtyard at Pat O'Brien's, under-aged Lyle could not enter the bar. Lyle arranged to meet up with the group at Pat O'Brien's back entrance, but he got lost. Lyle and his father spoke on the phone in an attempt to reconnect with the group. While on the phone, Lyle was physically assaulted, detained, and ultimately arrested without lawful authority by the Louisiana State Police.

Lyle Dotson did nothing other than stand on a public street in the French Quarter. But on his first morning in New Orleans, he found himself standing in front of his father, his father's students, and the public in municipal court, wearing prison orange. Rather than uphold their obligation to make the French Quarter and City of New Orleans a safe and pleasant destination for visitors, the Louisiana State Police's unconstitutional and racially-driven policies, practices, and customs achieve precisely the opposite, endangering and injuring individuals visiting New Orleans.

In support of these claims, Plaintiffs state as follows:

## I.      JURISDICTION

1.   This action is brought pursuant to 42 U.S.C. § 1983 and §1988, alleging violations of the First, Fourth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

2. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions. Plaintiffs also invoke supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. § 1367.

## II.  PARTIES

**Plaintiffs**

3. LYLE DOTSON is a person of the full age of majority and a citizen of the State of Indiana and is currently domiciled in Muncie, Indiana.

4. OLON DOTSON is a person of the full age of majority and a citizen of the State of Indiana and is currently domiciled in Muncie, Indiana.

**Defendants**

Named defendants herein are:

5. COL. MICHAEL EDMONSON, is a person of the full age of majority and a resident of Baton Rouge, State of Louisiana, in his individual capacity. At all times described herein, MICHAEL EDMONSON was the Superintendent of the LSP, and as such, was responsible for the supervision, administration, policies, practices, customs, operations, training, staff, and operation of the LSP. EDMONSON was and is a final policymaker, and at all pertinent times was acting under color of state law and in the course and scope of his employment. EDMONSON is liable both directly and vicariously for the actions complained of herein.

6. CAPTAIN DONOVAN ARCHOTE is a person of the full age of majority and a resident of Baton Rouge, State of Louisiana, in his individual capacity. At all times described herein, DONOVAN ARCHOTE was the local Troop Commander for

3

LSP Troop B and detail supervisor for Local Agency Compensated Enforcement Detail, and as such, was responsible for the supervision, administration, policies, practices, customs, operations, training, selection, and assignment of troopers and officers relevant to the Local Agency Compensated Enforcement Detail. DONOVAN ARCHOTE was and is a final policymaker, and at all pertinent times was acting under color of state law and in the course and scope of his employment. ARCHOTE is liable both directly and vicariously for the actions complained of herein.

7.  TROOPER HUEY MCCARTNEY is a person of the full age of majority and a resident of Baton Rouge, State of Louisiana, in his individual capacity. At all times described herein, HUEY MCCARTNEY was employed as a law enforcement officer of the LSP and detailed to the Local Agency Compensated Enforcement Detail in New Orleans. At all pertinent times, he was acting under color of state law and in the course and scope of his employment. MCCARTNEY is directly liable for the actions complained of herein.

8.  TROOPER CALVIN ANDERSON is a person of the full age of majority and a resident of Baton Rouge, State of Louisiana, in his individual capacity. At all times described herein, CALVIN ANDERSON was employed as a law enforcement officer of the LSP and detailed to the Local Agency Compensated Enforcement Detail in New Orleans. At all pertinent times, he was acting under color of state law and in the course and scope of his employment. ANDERSON is directly liable for the actions complained of herein.

9. TROOPER TAGIE JOURNEE is a person of the full age of majority and a resident of Baton Rouge, State of Louisiana, in his individual capacity. At all times described herein, TAGIE JOURNEE was employed as a law enforcement officer of the LSP and detailed to the Local Agency Compensated Enforcement Detail in New Orleans. At all pertinent times, he was acting under color of state law and in the course and scope of his employment. JOURNEE is directly liable for the actions complained of herein.

10. TROOPER RENE BODET is a person of the full age of majority and a resident of Baton Rouge, State of Louisiana, in his individual capacity. At all times described herein, RENE BODET was employed as a law enforcement officer of the LSP and detailed to the Local Agency Compensated Enforcement Detail in New Orleans. At all pertinent times, he was acting under color of state law and in the course and scope of his employment. BODET is directly liable for the actions complained of herein.

## III.    FACTUAL ALLEGATIONS

11. On the evening of October 7, 2015, eighteen-year-old Lyle and his father, Olon Dotson, arrived in the City of New Orleans. They were accompanied by a group of architecture students and faculty from Ball State University. Olon Dotson is a professor of architecture at the University.

12. Upon arriving in New Orleans, the group set about enjoying the offerings of the French Quarter, stopping first at Café Du Monde to enjoy beignets. Their next destination was Pat O'Brien's, where they planned to walk through the courtyard

space. A little after 8:00 p.m., Professor Dotson left briefly to check the group into a hotel. Lyle remained with the group for the walk through.

**13.** Upon arriving at the Pat O'Brien's entrance on St. Peters Street, Lyle was informed that he could not enter the bar because he was under-aged. The group arranged to meet him at the back entrance of Pat O'Brien's, located on Bourbon Street, after they walked through the building and courtyard.

**14.** In attempting to find the back entrance to the bar, Lyle became lost and ended up near the intersection of Bourbon Street and Toulouse Street, having missed the small signage marking the bar's back entrance halfway between St. Peter's Street and Toulouse Street on Bourbon Street.   Because of this confusion, Lyle was not there to meet up with members of the group after they had finished their short walk through.  Members of the group called Professor Dotson to inform him that they could not find Lyle and began to search for him.  Professor Dotson called his son to try to direct him back to the group.  Lyle answered the call and moved away from the noise of Bourbon Street onto Toulouse Street to speak with his father.

## A. LSP OFFICERS USED UNCONSTITUTIONAL FORCE AND RESTRAINT TO STOP AND DETAIN LYLE

**15.** As Lyle was speaking to his father, three LSP troopers, Defendants MCCARTNEY, ANDERSON and JOURNEE (hereinafter LSP Officers) came upon Lyle very aggressively, without warning, and without announcing themselves. Lyle believed he was being attacked.

**16.** Lyle had a momentary sense of relief when he realized the people grabbing him were real police officers, not street performers in costume.  This relief was short

lived, as the officers were not there to offer him assistance, but were intent on causing harm.

17. One of the officers grabbed Lyle's hand that was holding the phone and took the phone. Professor Dotson heard his son exclaim "whoa," and also believed his son was being attacked. The phone went dead.

18. Professor Dotson made repeated attempts to call Lyle back with no answer. He became increasingly alarmed and concerned for Lyle's safety as time passed without being able to reach his son.

19. Meanwhile Defendant MCCARTNEY demanded to know who Lyle had been speaking with on the phone. Lyle cooperated with the officers and explained that he had been speaking with his father, that he was a high-school student on a trip with his father's college class, that he had gotten lost, and that he was trying to reconnect with his group.

20. Defendants ANDERSON and JOURNEE restricted Lyle's movement by standing on either side of him and grabbing both of Lyle's hands, preventing him from moving away. Based on LSP's own incident report and gist, the officers' only basis for approaching Lyle was to determine his identity. The LSP Officers had no justification or basis for grabbing Lyle or restricting his movements in the course of seeking to identify him.

21. Lyle asked to know why he was being arrested, but the officers said they were only "detaining" him. Lyle then asked why he was being "detained," but the officers refused to answer. Lyle then asked for the officers' badge numbers, to which Defendants ANDERSON and MCCARTNEY responded "1234" and "5678". When

Lyle asked for their names, Defendant JOURNEE, responded "Michael Jordan". On information and belief, the officers were not wearing name tapes, badges, or any other identifying information visible to Lyle.

22. The LSP Officers then pushed Lyle against a building, scraping his arm. The LSP Officers forced apart Lyle's legs and searched three to four times. LSP Officers handcuffed Lyle during this search, though on information and belief, the officers did not inform Lyle that he had a right to refuse the search. In the course of the pat search, the officers obtained Lyle's wallet, which included his high school student photo identification.

23. After restraining Lyle against the wall and performing the repeated pat searches, the LSP Officers told Lyle that they had received a call that he had been following someone. Defendant BODET, working undercover in the French Quarter, incorrectly "pointed out" Lyle as an individual who had been following him "for an extended period of time."

24. Defendant BODET directed the LSP Officers to Lyle based on race. As documented in LSP's own report, BODET was only able to describe "a black male" wearing red jeans and black shirt. Though Defendant BODET presumably would have had ample opportunity to observe crucial identifying characteristics such as clothing details, facial hair, and shoes during this "extended period of time," he did not do so.

25. Video evidence establishes that there was another African-American man wandering up and down the same block of Bourbon Street (near Toulouse Street) for several hours, i.e., an "extended period of time." This individual had clearly

8

visible *facial hair* on his chin, a short twist hairstyle, red *shorts*, white socks and *sandals*, and a black shirt with a large logo in *white* lettering.

26. That evening Lyle was *clean-shaven*. His hair was cut low with no twists. He was wearing red *pants*, closed toed *shoes*, and a black shirt with large logo in *red* lettering. The only thing the two men had in common were that they were both wearing red bottoms and black tops, and that they were African-American men.

27. Upon questioning by the officers, Lyle explained that he could not possibly be the individual they received a call about because he had only recently arrived in the French Quarter, and he had only been in the area for a few minutes.

28. Throughout the course of this stop, Professor Dotson was calling Lyle's phone, which was now in the possession of Defendant MCCARTNEY. Lyle had an iPhone that prominently displays the identity of an incoming caller, with a contact name appearing on the screen even when the phone is locked. With each of Professor Dotson's calls to Lyle's phone, the screen would have lit up to show "Dad" as the caller. The LSP Officers should have recognized that the repeated incoming calls from "Dad" supported Lyle's truthful account as to his identity and his whereabouts. The LSP Officers also had an obligation to conduct further investigation to develop exculpatory evidence prior to restricting Lyle's movement.

29. The LSP Officers had explicitly told Lyle that he was not under arrest. Regardless, the LSP Officers continued to restrict Lyle's movement with handcuffs and by pinning him against the wall.

30. Then MCCARTNEY used his *personal* cell phone to shine a bright light into Lyle's eyes and told Lyle that he was taking photographs of him. On information and

belief, the LSP Officers were seeking to photograph Lyle at the request of Defendant BODET. According to LSP's own report, the LSP Officers had not received any new information to justify or create any legal basis for photographing Lyle. Lyle became suspicious and concerned about the motivations behind the LSP Officer's attempt to photograph him. Lyle told the police he did not consent to having his photograph taken.

31. Officer MCCARTNEY told Lyle that the only way he would not have his photograph taken was if he unlocked his phone to show them the call log.  Lyle remained restrained by the officers as he struggled to unlock his phone. Officer MCCARTNEY continued to attempt to take Lyle's photo anyway. Lyle continued to turn his face away, but Defendants continued to unlawfully restrict Lyle's movement, preventing him from holding up his hands to shield his face and from walking away. When Defendant MCCARTNEY stooped to take Lyle's photograph from a lower angle, Lyle raised his knee to block his face from the camera. In the course of raising his leg, Lyle's foot came close to the officer's hand. The LSP Officers threatened and taunted Lyle that if he did not allow them to take his photograph, they would claim he had kicked them. MCCARTNEY included in his report the allegation that Lyle kicked him twice, but this allegation is entirely unsupported.

32. As Lyle continued to refuse to allow the officers to take his photograph, the officers informed Lyle that they were arresting him and taking him to jail. Defendant LSP Officers tightened the handcuffs on Lyle, leaving marks that were visible on him the following day and causing numbness in his fingers. The LSP Officers grabbed

the back of Lyle's shirt, pulling it tight around his neck and choking him. The LSP Officers walked Lyle to the New Orleans Police Department ("NOPD") Eighth District Station, several blocks away. Lyle requested to have the handcuffs or hold adjusted because he was in pain, but the LSP Officers refused.

33. In physical pain and now being forcibly taken to another location without any lawful basis, Lyle called out to bystanders to video what was happening and protesting the basis of the arrest.

34. Lyle was searched again when he arrived at the Eighth District Station. His handcuffs were then secured to a bench behind his back, without any adjustment to loosen the cuffs.

35. After the arrest, Defendant LSP Officers continued to taunt Lyle, telling Lyle that he should have just consented to have his photograph taken. The LSP Officers implied that the arrest was in fact based entirely on Lyle's lawful refusal to permit a law enforcement officer photograph him on a personal cell phone during an unlawful stop. Lyle continued to assert his rights, telling LSP Officers that he had never given consent to have his photograph taken. Defendant LSP Officers told Lyle that his refusal did not matter, because they had already taken three photographs of Lyle on the officer's phone.

36. Meanwhile, Professor Dotson had become increasingly frantic in the search for his son who had just disappeared without explanation. Professor Dotson called the police with the intent to file a missing persons report when the police informed him that they had his son. Professor Dotson arrived at the Eighth District Station to see

11

his son, handcuffed to a bench. Professor Dotson was told that Lyle was under arrest for assaulting a police officer.

37. Lyle was then taken out to a van with the arresting LSP Officers. He was going to be driven to the Orleans Parish Prison (the jail). The LSP Officers had given Lyle his phone back and he was able to call Professor Dotson and tell him that he was being transported to the jail.

## B. THE EFFECTS OF LSP'S UNCONSTITUTIONAL CONDUCT EXTENDED FOR MONTHS AFTER THE UNCONSTITUTIONAL STOP AND ARREST

38. Lyle was booked into the Orleans Parish Jail facility, and remained there until around 2:30 p.m. on October 8, 2015 when he was brought to Municipal Court. In the course of booking, all of Lyle's fingerprints were scanned and have been entered into multiple law enforcement databases, an invasion of privacy that occurred only on the basis of an unconstitutional and baseless arrest. Lyle did not know what was going to happen at the jail, though he knew he had to get out soon in order to return to school the next week. He was in a constant state of heightened awareness, preparing for any possible scenario.

39. When he was finally brought to Municipal Court, dressed in his orange prison jumpsuit, he saw his father, the other Ball State faculty member and the students enter the courtroom. Lyle felt both bolstered by this show of support, and also acute shame and guilt that the whole trip had been altered because of him.

40. Professor Dotson posted a cash bond immediately and the Municipal Court Judge ordered Lyle's release. Lyle was not released from the jail until 1:38 a.m. on

October 9, 2015. Lyle remained in the unsafe and unsanitary conditions at the Orleans Parish Jail facility for another ten hours after Professor Dotson posted the bond.

41. The criminal charge against Lyle was subsequently dismissed, and the case was ultimately expunged in June 2016.

42. LSP Troop B, under the direction of Defendants ARCHOTE and Superintendent EDMONDSON issued a news release on November 10, 2015 naming wanted and arrested individuals under the title "Louisiana State Police Make 40 Arrests for Drug Activity in New Orleans." This public list includes Lyle's name, though his wrongful arrest had no relation to any drug activity. The list was posted on LSP's Facebook page and distributed to news outlets. Several prominent news outlets, including NOLA.com and Fox8 news picked up the story, further broadcasting Lyle's name in a false and misleading light.

43. The NOLA.com post used the verbatim text of EDMONSON'S press release, thus spreading the false statement that Lyle Dodson was one of "40 Arrests for Drug Activity in New Orleans." Even after the criminal charge against Lyle was dismissed and expunged, an Internet search of Lyle's name today still pulls up these headlines. A friend of Lyle's found Lyle's name posted on a website in association with this charge.

44. The wrongful arrest and public mischaracterization of the arrest came at a particularly sensitive time for Lyle. Lyle was finishing high school and was in the process of applying for college. In filling out college applications, he ultimately

abandoned an application to Tuskegee University because he felt such discomfort in answering the application's question regarding prior arrests and convictions.

45. Lyle has had to spend the last year fighting unfounded criminal charges against him. Lyle and his father had to seek funds through a crowd funding website to help cover the costs associated with this lengthy process. Ultimately, after substantial lawyer's fees and the stress of navigating an unfamiliar and byzantine justice system, the charges were dismissed. For additional lawyers' fees, Lyle was finally able expunge the arrest, but the acute public embarrassment of the unlawful detention and arrest remains.

## C. LSP ENGAGED IN A PATTERN AND PRACTICE OF UNCONSTITUTIONAL STOPS AND ARRESTS BASED ON RACE

46. The LSP Officers' hostile, aggressive approach and clear mistake in identity are consistent with a pattern and practice of racially-biased unconstitutional stops, arrests, and excessive force by the LSP patrolling the French Quarter under the direction and supervision of Defendants EDMONSON and ARCHOTE. Previous incidents illustrate this pattern:

    a. In February 2013, LSP Troopers approached and surrounded Sidney Newman and Ferdinand Hunt, two young African-American men lawfully standing in a public space in the French Quarter. One group of troopers slammed Mr. Newman to the ground and restrained him by straddling him without any legal cause whatsoever. Another group of troopers restrained Mr. Hunt against the wall of a restaurant, again without any legal cause. Defendant EDMONSON was aware of this

unlawful stop and excessive use of force. In response, he ordered a wholly inadequate internal investigation into the officers' actions, ultimately finding the stop and use of force was justified. However, the Mayor of New Orleans publicly condemned the investigation and handling of the stop and excessive use of force on Mr. Newman and Mr. Hunt. Nevertheless, on information and belief, none of the troopers involved in this incident were disciplined.

b. In August 2015, LSP troopers unlawfully stopped and used excessive force on musician Shamarr Allen, approaching him with weapons drawn, pulling him out of his vehicle, throwing him onto the ground, and interrogating him for half an hour. LSP troopers were allegedly searching for a drug dealer, but had no basis to stop Mr. Allen. Defendant EDMONSON was aware of this unconstitutional behavior, and defended his officers, insisting that they used an appropriate amount of force and were justified in making the stop because the officers were "on high alert". *See* Naomi Martin, "Troopers release video showing forceful stop of musician Shamarr Allen", NOLA.com / The New Orleans *Times-Picayune*, August 5, 2014, accessed at *http://www.nola.com/crime/index.ssf/2014/08/state_police_releases_d ashcam.html* (September 24, 2016).

47. Despite these instances of unlawful stops, on May 5, 2015, the City of New Orleans opted to enter into a cooperative endeavor agreement (hereinafter "May CEA") with the LSP, specifically Troop B under the command of Defendant ARCHOTE. The

May CEA explicitly provides for LSP troopers to patrol areas with a history of high crash rates, as "determined by the Troop Commander," Defendant ARCHOTE. The May CEA further provides that "the selection of troopers and officers and the assignment of said troopers and officers shall at all times and under all circumstances be the prerogative of the Troop Commander [ARCHOTE] or his designated assistants."

48. Beyond the black and white terms of the May CEA, LSP operates in concert with, and as an agent of, the City of New Orleans for the purpose of supplementing the force of the NOPD. This relationship existed even prior to the May CEA and continues today.[1] The procedures Defendant LSP Officers followed the night of Lyle's arrest suggests the nature of this relationship. Defendants MCCARTNEY and ANDERSON completed a NOPD Gist Sheet and a NOPD Incident Report, assigning an NOPD item number to the incident. Notably, both of these forms call for a supervisor's signature, which was left blank. LSP Officers transported Lyle to the NOPD's Eighth District Station, which on information and belief is also LSP's base during special detail operations similar to the one Defendant LSP Officers were working.

49. After the City of New Orleans and LSP entered into the May CEA, on September 18, 2015, just three weeks prior to LSP's unlawful stop of Lyle, LSP Officers unlawfully stopped and used excessive force on Michael Baugh, also an African

---

[1] The City of New Orleans, LSP, and the French Quarter Economic Development District have entered into an additional contract effective January 1, 2016 that continues the substantive terms of the May CEA for the French Quarter specifically.

16

American man.[2] As in Lyle's stop, the officers stopped the wrong person, missing key distinguishing elements between the people they had received calls regarding and Mr. Baugh. As in Lyle's case, the officers should have known that they had the wrong person. They were on the wrong street; Mr. Baugh's vehicle did not match the description of the vehicle they had received calls about; and Mr. Baugh was alone while the LSP Officers had been sent to look into an incident reported to involve *four* men. As in Lyle's case, the officers only saw the silhouette of a black man and responded first with aggression and hostility, refusing to gather or consider any additional information regarding the individual's identity. As in previous instances of wrongful stops based on biased police practices, four days after that stop, Defendant EDMONDSON made public statements condoning and ratifying the use of "stop and frisk" and illegal and unconstitutional stops of citizens in the City of New Orleans, stating that the LSP have adopted a policy of stop and frisk in New Orleans.

50. On information and belief, though the troopers involved in this incident were under Defendant ARCHOTE's direct command, he never took and action to investigate, discipline, or remove any of the involved troopers from assignments related to patrolling areas in and around the French Quarter.

51. It is significant that neither the May CEA nor any other historical practice or procedure in the relationship between the City of New Orleans, NOPD, and/or LSP incorporates or even refers to the New Orleans Police Department Consent Decree. The Consent Decree was agreed to by the City of New Orleans, NOPD, and the

---

[2] This stop occurred in the 100 block of South Rampart Street, outside of the French Quarter in the Central Business District.

Department of Justice, and adopted by the Court on January 11, 2013. *See United States of America v. City of New Orleans*, E.D. La., 12-cv-1924, ECF No. 2-1.

52. The stated goal of the Consent Decree is to ensure "that police services are delivered to the people of New Orleans in a manner that *complies with the Constitution and laws of the United States*. The Parties have a shared recognition that the ability of a police department to protect the community it serves is only as strong as the relationship it has with that community. Public safety, constitutional policing, and the community's trust in its police force are thus interdependent. The full and sustained implementation of this Agreement is *intended to protect the constitutional rights of all members of the community*, improve the safety and security of the people of New Orleans, and increase public confidence in the New Orleans Police Department." E.D.La., 12-cv-1924, ECF No. 2-1 at 6 (emphasis added).

53. Further, the NOPD Consent Decree "is binding upon all Parties hereto, by and through their officials, *agents*, employees, and successors. If the City establishes or reorganizes a government agency or entity whose functions include overseeing, regulating, accrediting, investigating, or otherwise reviewing the operations of NOPD or any aspect thereof, the City agrees to ensure these functions and entities are consistent with the terms of this Agreement and shall incorporate the terms of this Agreement into the oversight, regulatory, accreditation, investigation, or review functions of the government agency or entity *as necessary to ensure consistency*." E.D.La., 12-cv-1924, ECF No. 2-1 at 8 (emphasis added).

54. Specifically, the Consent Decree requires that "all NOPD investigatory stops, searches, and arrests are conducted in accordance with the rights secured or protected by the Constitution and laws of the United States . . . . NOPD officers may only conduct investigatory stops or detentions where the officer has reasonable suspicion that a person has been, is, or is about to be engaged in the commission of a crime . . . . NOPD officers shall not use race, color, ethnicity, national origin, religion, gender, disability, or sexual orientation as a factor to any extend or degree, in establishing reasonable suspicion or probably cause, except as *part* of an actual and apparently credible description of a specific suspect or suspects in a criminal investigation . . . . NOPD officers shall continue to require reasonable suspicion to conduct field interviews, and document investigatory field contacts, including field interviews . . . ." E.D.La., 12-cv-1924, ECF No. 2-1 at 43 (emphasis added).

55. Further, the NOPD Consent Decree states, "The City and NOPD agree to require compliance with this Agreement by their respective officers, employees, agencies, assigns or successors." E.D. La. 12-cv-1924, ECF No. 2-1 at 126.

56. Providing for a patrolling law enforcement force in the French Quarter without adopting the NOPD Consent Decree into the May CEA, or adopting any other such policy or practice to govern the LSP's work in the City of New Orleans, the City of New Orleans and LSP have undermined the stated intentions of the NOPD Consent Decree and have failed to ensure constitutional law enforcement standards. In at least three prior instances, LSP officers violated the constitutional rights of New Orleans citizens (and also ran afoul of the the substantive terms of the Consent Decree) with the explicit approval and backing of Defendant EDMONSON. At

least two of these instances of rights violations occurred prior to the May CEA, which the City of New Orleans still opted to negotiate and execute.

57. Additionally, standard practice in most jurisdictions in the United States, current NOPD policy and procedure, and the NOPD Consent Decree all call for significant supervisor involvement and review of stops, warrantless searches, and arrests for charges related to resisting arrest, including review of incident reports generated by these activities. The NOPD Gist Sheet and Incident Report forms Defendant MCCARTNEY completed after Lyle's arrest each have space for a supervisor's signature, but this space was left blank. On information and belief, the LSP under the command of Defendant EDMONSON has no policy or procedure for supervisory review of incident reports generated from stops, warrantless searches, and arrests for charges related to resisting arrest. This policy and practice of failing to have routine supervisory review of potential abuses of police power breeds an environment in which officers may violate citizen's rights with impunity and without fear of reprimand.

58. Upon information and belief, Defendant EDMONSON and Defendant ARCHOTE have developed, implemented, maintained, and repeatedly failed to correct unconstitutional policies, customs, and practices that directly resulted in harm to Lyle and Olon Dotson and the violation of their rights. These policies, customs, and practices include but are not limited to the following:

    a. Developing and maintaining policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons;

b. Failing to adequately and properly investigate allegations of misconduct and/or violations of law by LSP Troopers, supervisors, or commanders, or to properly initiate or conduct investigations of LSP troopers, supervisors, or commanders suspected of misconduct and/or violations of law, and instead tolerating the misconduct of officers and mistreatment of members of the public;

c. Failing to keep accurate and reasonable records of incidents involving allegations of police misconduct and the investigation, handling, and resolution of allegations of police misconduct, in order to avoid public scrutiny and accountability;

d. Failing to provide adequate or reasonable supervision, discipline, monitoring, or control of LSP troopers assigned to street patrol units and/or detail assignments, including Defendant Officers;

e. Failing to adequately hold supervisory or command officers responsible for the misconduct of their subordinates;

f. Condoning, approving, and authorizing a culture and environment within LSP in which LSP personnel, including Defendants herein, had the reasonable belief or expectation that their actions would not be properly monitored by supervisory or command officers and that their misconduct and/or unlawful actions would not be thoroughly investigated or sanctioned, but would be condoned and tolerated;

g. Failing to properly screen before hiring and failing to properly supervise, discipline, monitor, or control LSP officers under their

jurisdiction and control, including defendant officers, supervisors and commanders;

h.   Failure to maintain bias free policing, particularly in authorizing, permitting, ratifying, and condoning policies, practices, customs, and procedures whereby African-Americans have been harassed, intimidated, disrupted, and suffered interference with their constitutionally-protected activities involving the rights to speech, expression, association, locomotion, travel, and privacy;

i.   Failing to conduct appropriate in-service training, re-training, or enhanced supervision of officers who were known to or suspected to have engaged in misconduct but for whom disciplinary actions were not available;

j.   Failing to reasonably or appropriately monitor civil litigation or police misconduct revealed through criminal proceedings so as to take corrective and/or disciplinary action when necessary, including the actions of Defendant Officers;

k.   Failing to keep accurate or easily accessible records of the amount of money spent by the State in defending, settling, and paying judgments in litigation involving misconduct by LSP personnel, so as to avoid accountability and scrutiny of the level of LSP officer misconduct;

l.   Failing to properly operate, maintain, and staff an adequate early warning system to flag LSP personnel who engage in a pattern of improper behavior or violation of citizens' rights or emotional or

22

psychological conditions which could lead to violations of citizens' rights and institute appropriate monitoring, supervision, training, or intervention of said personnel.

**59.** The above-described policies, practices, and customs demonstrate the deliberate indifference on the part of policy makers, including Defendant EDMONSON and Defendant ARCHOTE, to the constitutional rights of the public, and were the cause of the violation of plaintiffs' rights alleged herein.

### D. LIABILITY OF DEFENDANTS

**60.** All of the defendants are liable to the plaintiff for compensatory and punitive damages.

**61.** All of the defendants are liable jointly, severally, and in solido for the plaintiffs' injuries.

**62.** The defendants' actions were intentional, callous, reckless, willful, wanton, and malicious, and constituted deliberate indifference to the rights of the plaintiffs. The Defendants' acts and omissions were done in concert and in conspiracy to violate the legal and constitutional rights of the plaintiffs, Lyle and Olon Dotson. The defendants' actions were the proximate cause of the violation of plaintiffs' rights and damages sustained by plaintiffs.

**63.** As a result of the acts and omissions described herein, Lyle Dotson was unlawfully deprived of his liberty, and was prevented from and punished for exercising his constitutionally protected rights. Further as a direct result of the actions of Defendants, Lyle suffered physical pain and injury, and false imprisonment. Further Lyle and Olon Dotson both suffered psychological pain, emotional distress, mental

anguish, embarrassment, humiliation, inconvenience, and incurred legal and medical bills.

## IV.   CAUSES OF ACTION

### COUNT 1:

### § 1983 Violations Based on

### Unconstitutional Policies, Customs, Usages, Practices, and Procedures by

### DEFENDANTS EDMONSON AND ARCHOTE

**64.** Defendants named in this Count, acting individually and together, under color of law, acted to violate Lyle Dotson's rights to be on a public street, to privacy, to be left alone, to locomotion, to travel, to due process of law, to equal protection of the law, to freedom from unreasonable search and seizures, to freedom from excessive force, and to freedom from cruel and unusual punishment protected under the First, Fourth, Eighth, Ninth and Fourteenth Amendments.

**65.** Defendants EDMONSON and ARCHOTE, in their individuals capacities, failed to supervise their subordinates, namely MCCARTNEY, ANDERSON, JOURNEE and BODET, to ensure that these subordinates did not violate members of the public's rights protected under the First, Fourth, Eighth, Ninth, and Fourteenth Amendments. Lyle Dotson was directly harmed by this failure to supervise because it contributed to the unlawful stop, detention, and arrest of Lyle Dotson. At all pertinent times herein, Defendants EDMONSON and ARCHOTE were aware of the need to supervise their subordinates in order to ensure that they did not violate the rights of members of the public. These defendants ignored that need and acted

unreasonably and with deliberate indifference and disregard for Lyle Dotson's constitutional rights as described above.

66. As final policy makers for LSP, Defendants EDMONSON and ARCHOTE, in their individual capacities, acting individually and together, acted to violate Lyle's rights by establishing and maintaining policies, customs, usages, practices, and procedures that they knew would deprive members of the public, including Lyle Dotson, of their constitutional rights protected under the First, Fourth, Eighth, Ninth, and Fourteenth Amendments. Lyle Dotson was directly harmed by these policies, customs, usages, practices and procedures because these policies contributed to the unlawful stop, detention, and arrest of Lyle Dotson. At all pertinent times herein, Defendants EDMONSON and ARCHOTE were aware that the policies, procedures, practices, customs, and usages they established for LSP would result in violations of constitutional rights. These defendants ignored that risk and acted unreasonably and with deliberate indifference and disregard for Lyle Dotson's constitutional rights as described above.

67. At all pertinent times, the defendants named in this Count, individually and collectively, were acting under color of state law and in the course and scope of their employment. Defendants named in this Count acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of the plaintiff by failing to provide appropriate safeguards to prevent the misconduct of officers patrolling the French Quarter.

## COUNT 2:

### § 1983 Violations for

### the Unlawful Stop, Detention, Arrest, and Excessive and Unreasonable Force
### by DEFENDANTS MCCARTNEY, ANDERSON, JOURNEE AND BODET

**68.** Defendants MCCARTNEY, ANDERSON, JOURNEE, and BODET's unlawful stop, detention, arrest, and handcuffing of Lyle without cause or justification violated Lyle Dotson's rights to be on a public street, to privacy, to be left alone, to locomotion, to travel, to due process of law, to equal protection of the law, to freedom from unreasonable search and seizures, to freedom from excessive force, to freedom from cruel and unusual punishment, and to freedom from false arrest and detention. These rights are protected under the First, Fourth, Eighth, Ninth, and Fourteenth Amendments to the United State Constitution.

**69.** At all times Defendants MCCARTNEY, ANDERSON, JOURNEE, and BODET were acting under color of law and were aware that uses of force, stops, detention, arrest, and handcuffing of members of the public without any justifiable basis were unlawful.

26

## COUNT 3:

## Negligent and/or Intentional Conduct

## Resulting in Injuries to Lyle and Olon Dotson

## by DEFENDANTS EDMONDSON, ARCHOTE, MCCARTNEY, ANDERSON, JOURNEE, AND BODET

70. The above-named defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that caused injury and harm to Lyle Dotson.

71. Namely Defendants MCCARTNEY, ANDERSON, JOURNEE and BODET assaulted, battered, and held Lyle Dotson under false arrest without cause or justification.

72. Defendants MCCARTNEY, ANDERSON, JOURNEE, and BODET caused intentional infliction of emotional distress on Olon Dotson, who witnessed the first assault and battery by above-defendants on his son aurally while on the phone, and who, because of the tortious interference of the above-defendants, believed his son had been injured or abducted for over an hour.

73. Defendants EDMONDSON and ARCHOTE negligently hired and maintained the employ of Defendant Officers.

74. Defendants EDMONDSON, ARCHOTE, MCCARTNEY, ANDERSON, JOURNEE, and BODET negligently intruded on Lyle Dotson's right to privacy and caused him to be portrayed in a false light by publishing and disseminating Lyle Dotson's name and age under a headline fictitiously categorizing the arrest as drug related.

27

**75.** At all times pertinent herein, these Defendants, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently towards Lyle and Olon Dotson. Furthermore, these defendants, individually and collectively, had the duty and ability to intervene to prevent the tortious conduct of co-defendants toward Lyle and Olon Dotson, as described herein, but failed to do so. They are therefore liable to Plaintiffs, as described herein.

## COUNT 4:

### Respondeat Superior Liability of EDMONSON and ARCHOTE

**76.** At all relevant times, the individually named defendants were acting in the course and scope of their employment with defendants EDMONSON and ARCHOTE and the Louisiana State Police. EDMONSON and ARCHOTE are therefore liable under the doctrine of Respondeat Superior for the actions and inactions of the individual defendants, as described herein.

## V.     DAMAGES

**77.** As a result of the actions of Defendants as described above, damages have been incurred as follows:

1.     LYLE DOTSON suffered conscious and severe physical, mental, and emotional distress, pain, and suffering in the course of this incident. His reputation was harmed by being included in a publically-released statement that he was one of "40 Arrests for Drug Activity in New Orleans," a statement posted verbatim by a prominent news website.

2.     OLON DOTSON, the father of LYLE DOTSON and witness to the events described supra, suffered emotional pain and suffering, past, present, and

future, and has incurred expenses associated with the defense and expungement of the wrongful arrest and associated charge.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that after due proceedings there be judgment rendered herein in Plaintiffs' favor and against all Defendants individually and jointly, as follows:

1.     Compensatory and punitive damages as prayed for herein;

2.     Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. 794(b), and all costs of these proceedings and legal interest;

3.     All other relief as appears just and proper to this Honorable Court.

Respectfully submitted,


___s/ James W. Craig_____
James Craig, LSBN # 33687
Emily Washington, LSBN # 34143
Roderick & Solange MacArthur Justice Center
4400 S. Carrolton Ave.
New Orleans, LA 70119
Tel. 504-620-2259
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org

- AND -


_____
Elizabeth Cumming, LSBN #31685
316 S. Dorgenois Street
New Orleans, LA 70119
Tel. 504-822-4455
Fax. 504-822-4458
ecumminglaw@gmail.com


*Attorneys for Plaintiffs*