UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| LYLE DOTSON, ET AL. | * | CIVIL ACTION NO. 16-15371 |
|---|---|---|
| | * | |
| | * | SECTION: "E"(1) |
| VERSUS | * | |
| | * | JUDGE SUSIE MORGAN |
| | * | |
| COL. MICHAEL EDMONSON, ET AL. | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

ORDER AND REASONS

Before the Court is the Motion to Compel the Louisiana State Police ("LSP") to produce subpoenaed documents. (Rec. Doc. 36). For the following reasons, the Motion is GRANTED in part. Within 14 days, the LSP shall perform and complete a search for any recordings of communications on the evening of October 7, 2015, related to the "Jackson Square" arrest referred to in the Plaintiffs' motion. As to all other documents and information, the Motion to Compel is DENIED.

Background

As previously discussed by this Court in earlier discovery rulings, this lawsuit arises out of the purportedly wrongful arrest of plaintiff Lyle Dotson by certain LSP officers in the French Quarter in New Orleans on October 7, 2015. Plaintiffs assert that LSP officers were patrolling the French Quarter pursuant to a contract with the City of New Orleans. At the time, Lyle was eighteen years old and alleges that he was visiting New Orleans with his father, plaintiff Olon Dotson, a professor of architecture at Ball State University and a group of Professor Dotson's architecture students. The group was touring the French Quarter and sometime after 8:00 p.m., they arrived at the St. Peter's Street entrance of Pat O Brien's where they planned to walk through the courtyard and building. Lyle was not permitted to enter the bar because he was under-aged. Apparently his

1

group arranged for him to meet them at the back entrance of Pat O'Brien's on Bourbon Street after they walked through. According the Complaint, Lyle became lost and ended up at the intersection of Bourbon Street and Toulouse Street.

Professor Dotson called Lyle on his cell phone when the group discovered Lyle was not at the Bourbon Street entrance of Pat O'Brien's after the walk-through. According to the Plaintiffs, while they were talking, three LSP troopers, defendants Huey McCartney, Calvin Anderson, and Tagee Journee, "came upon Lyle very aggressively, without warning, and without announcing themselves." Lyle alleges that McCartney demanded to know who he had been speaking with and Anderson and Journee restricted his movement. Lyle alleges that the officers refused to identify themselves, pushed him against a building and searched him three or four times. Lyle alleges that the officers told him that a fourth officer, Rene Bodet, had been working undercover in the French Quarter, and had been following someone and that Lyle had been "pointed out" as the individual that had been following Bodet "for an extended period of time." Plaintiffs submit that Bodet directed McCartney, Anderson, and Journee to Lyle based on his race. They insist that the only similarities between the person Bodet had been following and Lyle was that they were both wearing red bottoms (Lyle in pants and the other individual in shorts), black shirts (with different colored logos), and that they were African-American men.

Plaintiffs allege that Lyle explained to McCartney, Anderson, and Journee that he could not have been the individual followed by Bodet because he just arrived in the French Quarter. They allege that McCartney used his personal cell phone to take pictures of Lyle. Plaintiffs believe they did so to send the photographs to Bodet. Apparently Lyle resisted having his photo taken, and plaintiffs allege that Lyle raised his knee to block his face from the camera and the officers told him that they would say he kicked them if he did not allow the photo to be taken. The officers

2

arrested Lyle and took him to jail. Lyle was released from jail at 1:38 a.m. on October 9, 2017, after Professor Dotson posted bond. Lyle's name appeared on a news website suggesting he had been arrested for drug activity, and Plaintiffs allege this posting still appears if Lyle's name is searched on the Internet. Lyle alleges that he abandoned an application to Tuskegee University because he felt such discomfort in answering questions about prior arrests and convictions. Eventually, after incurring "substantial lawyer's fees," the charges against Lyle were dismissed and expunged from his record.

Lyle and Professor Dotson filed this lawsuit on October 7, 2016, against officers McCartney, Anderson, Journee, Bodet, alleging that these officers violated Lyle's constitutional rights when they stopped, detained, and arrested him. Plaintiffs assert that defendants McCartney, Anderson, Journee, and Bodet were under Archote's direct command, and that Edmonson served as Superintendent of the LSP during the relevant period. Plaintiffs also sued Edmonson and Archote, alleging that they failed to supervise their subordinates McCartney, Anderson, Journee, and Bodet to ensure that they did not violate individuals' constitutional rights. Plaintiffs also allege that Edmonson and Archote are responsible for establishing and maintaining policies, customs, usages, practices, and procedures that they knew would deprives members of the public, including Lyle, of their constitutional rights. Plaintiffs also raise tort claims against all defendants.

## Discovery Issues

For some time now the Plaintiffs have been attempting to obtain documents from the LSP. Initially, they did so by serving discovery requests on the individual defendants.[1] Eventually, they issued a subpoena to the LSP. They received the LSP's objections on September 15, 2017. They

---

[1] It appears that Defendants' responses originally led the Plaintiffs to believe that Defendants had access to and could produce all the documents Plaintiffs sought. Only later did Defendants take the position that the documents they had been producing were those that LSP had agreed to hand over and that Defendants could not be compelled to produce documents that belonged to LSP if LSP refused to disclose them.

received selected documents on September 21, 2017. On September 26, 2017, this Court conducted a telephone conference with the parties regarding a previous motion to compel the Defendants to produce certain LSP documents. At that time, Plaintiffs were not prepared to discuss whether the documents they had received from LSP on September 21, 2017, were satisfactory. Ten days later, on October 6, 2017, they filed the present Motion to Compel LSP to produce certain documents and materials. They asked the Court to expedite the Motion, and the Court agreed to do so.

The present Motion to Compel seeks production of all LSP Policies and Procedures. Plaintiffs acknowledge that LSP has turned over 43 policies, which appear to include all of the policies that the Plaintiffs prioritized as most important to receive. Plaintiffs also seek production of an unredacted copy of two polices (included in the 43): the Critical Incident Response and Special Task Planning policy and the Pursuit/Roadblock policy. The Plaintiffs further seek audio records of radio calls for October 7, 2015, radio logs for that date, and procedures regarding use of cell phones. Finally, the Plaintiffs seek a desk log showing duty, post or detail assignments on the evening of October 7, 2015.

In granting the Motion to expedite, the Court also ordered that as to the additional policies sought by the Plaintiffs, the Motion to Compel was denied. The Court concluded that Plaintiffs had not shown sufficient relevance and need for those additional policies and that the production of additional policies would not be compelled unless specific need for a specific policy is articulated, based on more than a desire to demonstrate "LSP culture." The Court also ordered the LSP to respond to several questions regarding its search for documents. The LSP has now responded.

Law and Analysis

   a. *Subpoenas*

Under Rule 45, the Court may quash or modify a subpoena that "(i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception of waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. Proc. 45(d)(3); see Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 817–18 (5th Cir. 2004). The moving party bears the burden of showing that compliance with the subpoena would be unduly burdensome. Wiwa, 392 F.3d at 818; Informd, LLC v. DocRX, Inc., No. MC 16-83-JJB-EWD, 2016 WL 7478962, at *3 (M.D. La. Dec. 29, 2016). In assessing the undue burden, the Court considers "(1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." Wiwa, 392 F.3d at 818. Where a non-party is subject to a subpoena, "the court may also consider the expense and inconvenience to the non-party." Wiwa, 392 F.3d at 818. The Court should also consider whether the requested information is available from any other source. Positive Black Talk Inc. v. Cash Money Records, Inc., 394 F.3d 357, 377 (5th Cir. 2004) abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010).

Prior to the 2000 amendments, the Federal Rules provided for discovery of nonprivileged matter "relevant to the subject matter involved in the pending actions." The 2000 amendments deleted the quoted language, limiting the scope of discovery to nonprivileged matters "relevant to the claim or defense of any party" and allowing for discovery "of any matter relevant to the subject matter involved in the action" only upon a showing of good cause. Fed. R. Civ. Proc. 26; see XTO

5

Energy, Inc. v. ATD, LLC, No. CIV 14-1021 JB/SCY, 2016 WL 1730171, at *12–13 (D.N.M. Apr. 1, 2016) (analyzing the progressive rule changes); see also 8 Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2008 (3d ed.). The change "signal[ed] to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signal[ed] to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Fed. R. Civ. Proc. 26 advisory committee's notes to 2000 amendment. The committee explained that the parties should "focus on the actual claims and defenses involved in the action," but that a variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action." Id. Following the 2015 amendments to the Rules (which removed reference "to the subject matter involved in the action" entirely), courts have concluded that "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense.'" XTO Energy, Inc. v. ATD, LLC, No. CIV 14-1021 JB/SCY, 2016 WL 1730171, at *17 (D.N.M. Apr. 1, 2016) (quoting State Farm Mut. Auto. Ins. Co. v. Fayda, No. 14CIV9792WHPJCF, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015), aff'd, No. 14CV9792, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016)); Walker v. H & M Henner & Mauritz, L.P., No. 16 CIV. 3818 (JLC), 2016 WL 4742334, at *2 (S.D.N.Y. Sept. 12, 2016).

Thus, while construing relevance broadly, this Court is anchored by the parties' pleadings. "To implement the rule that discovery must be relevant to the claim or defense of any party, district courts have examined the relationship of the requested discovery and the facts it is intended to uncover to the specific claims and defenses raised by the parties." Thibault v. BellSouth Telecommunications, Inc., No. CIV.A. 07-200, 2008 WL 4808893, at *2 (E.D. La. Oct. 30, 2008)

(M.J. Wilkinson). For example, in reviewing the magistrate judge's discovery order, a district court explained that evaluating "the relevancy determination necessarily begins with an examination of [plaintiff's] claim in this case." <u>Volvo Trucks N. Am., Inc. v. Crescent Ford Truck Sales, Inc.</u>, No. CIV.A. 02-3398, 2006 WL 378523, at *4 (E.D. La. Feb. 17, 2006) (J. Zainey). The court looked to the claim plead and the way the plaintiff had defined its claim throughout the proceedings. <u>Id.</u> The plaintiff itself had been pursuing a very specific claim of breach of contract arising out of the defendant's alleged failure to obtain a signature. <u>Id.</u> The court observed that the plaintiff had attempted to broaden its claim by amending its complaint, but the court had denied that motion. <u>Id.</u> Thus, the court limited discovery to the specific claim the plaintiff had plead and had been pursuing, and the defenses raised by that claim. <u>Id.</u> Similarly, in <u>Hill v. Motel 6</u>, the court refused to permit discovery into a defendants' personnel files in search of evidence supporting an age discrimination claim based on discriminatory impact because the plaintiff had plead and had been pursuing only a discriminatory treatment claim. 205 F.R.D. 490, 493 (S.D. Ohio 2001).

  b. *Policies and Procedures*

As noted above, the Court has determined that additional LSP policies and procedures beyond the 43 already produced will not be compelled absent a specific showing of relevance and need. To date, Plaintiffs have made no showing of relevance or need for the policies and procedures that have not been produced (and even for some of those that have been). At most, Plaintiffs have vaguely referenced the relevance of these polices to an understanding of LSP's "culture." The Court does not address the merits of the Plaintiffs' "culture" theory. Instead, the Court has found that discovery of all LSP policies and procedures is not relevant to that theory. Simply saying the policies and procedures are relevant does not make it so. Dotson challenges his stop on the purported suspicion of drug possession or trafficking while walking in the French Quarter and his

7

subsequent arrest. What might possibly be discovered in the "DNA Collection" or "Educational Leave" policies that would provide more information regarding the culture of LSP as it pertains to that stop than in the 43 policies Plaintiffs have already obtained? These 43 polices include Organizational Structure, Arrests and Searches, Disciplinary, Employee Grievances, Criminal Investigations Division, Code of Conduct and Ethics, Law Enforcement Role, and Criminal Patrols. It is patently clear to the Court that the Plaintiffs are engaged in a blatant fishing expedition. It is important to note that in an earlier telephone conference with the parties, it was revealed that counsel for the Plaintiffs is involved in other litigation with the LSP on unrelated matters. The Court is concerned that Plaintiffs may be attempting an end run around discovery in those other proceedings by attempting to obtain documents in the course of this litigation that are irrelevant to the present claims.

The Federal Rules of Civil Procedure make clear this Court bears an important role in managing discovery. Plaintiffs' attempt to obtain documents that are completely irrelevant to their claims cannot be encouraged. Accordingly, the Court will not compel the LSP (or the Defendants, for that matter) to produce any additional LSP Policies or Procedures unless the Plaintiffs can explain with specificity why each such policy is relevant to the claims and defenses in this lawsuit.

With regards to the redactions from the Critical Incident Response and Special Task Planning policy, the Court is convinced that the interest of the LSP in maintaining portions of these policies confidentially is not outweighed by the Plaintiffs' desire for them. As an initial matter, the Court finds the relevance of this policy to the Plaintiffs' case questionable at best. The LSP points out that the Critical Incident Response and Special Task Planning policy deals with extraordinary events like hazardous material response, SWAT operations, and civil disturbances. Lyle Dotson's stop and arrest were not part of or related to any critical incident of the type covered by the policy.

8

The Court can fathom no reason such policies would be relevant to the Plaintiffs' claims and the Plaintiffs have presented none except the vague "culture" claim.

Further, the LSP has expressed a valid interest in maintaining the policy confidentially. The LSP explains that the redacted portions of this policy concern who is responsible for certain tasks, the critical tasks to be performed, the organizational structure of the response team, and terminology or jargon unique to such tasks.[2] Of course such policies might be compelled subject to a protective order if they were important to the Plaintiffs' case. Here however, in light of the indiscernible relevance of the policy to Plaintiffs' case, the un-redacted policy will not be compelled.

Similarly, the Pursuit/Roadblock policy is not relevant to the present matter. As the LSP explains, the Pursuit policy deals with vehicle pursuits, and Lyle Dotson's stop did not involve a vehicle pursuit. Further, LSP explains the redacted portions of the policy address circumstances officers consider when entering into a vehicle pursuit and tactics to employ when a pursuit crosses jurisdictional lines. Because the policy bears no relevance to Plaintiffs' claims, and because, again, LSP's safety concerns appear valid, the Court will not compel LSP to produce them over the LSP's concerns that such tactics be revealed publicly.

c. *Communications Information*

Plaintiffs' motion references a request for "procedures regarding use of cell phones." They do not provide any briefing on the status of this request or why they need this information. In response to the Court's order, the LSP submitted an affidavit of Captain Greg Graphia stating that

---

[2] Indeed, in light of recent catastrophic tragedies like the mass shooting in Las Vegas and the targeting of police in Baton Rouge, it is truly remarkable that Plaintiffs believe their interest in obtaining Critical Incident Response policies that have no bearing on their claims outweighs the interest of the LSP in maintaining the procedures regarding their responses to such catastrophes in confidence.

9

there are no LSP policies or procedures responsive to the request for "procedures governing personnel cell phone use in the course of trooper duties when a cell phone enrollment sheet has been submitted by a trooper." The Court finds this response sufficient and denies the Motion to Compel as to the cell phone procedures.

The Plaintiffs requested that the Defendants, and later requested that the LSP, produce any audio recordings for radio calls on October 7, 2015, as well as all radio logs for that date. At first, Defendants reported that "LSP did not retain records of these communications." On September 28, 2017, LSP produced one recording of Trooper 84 calling to Cabildo to request information on Lyle Dotson's license. Plaintiffs are concerned that other recordings may also exist. They note that they are particularly interested "in an earlier arrest in Jackson Square which the troopers relied upon to establish probably [sic] cause for stopping Lyle Dotson." Plaintiffs point out that the LSP's Communications Policy requires frequent radio contact and the New Orleans Criminal Enforcement Operations Policy provides details about which radio frequencies to use. They add that LSP's Code of Conduct and Ethics policy exempt police radio traffic from the ban on recording conversations without the consent of all parties. The Plaintiffs, not illogically, conclude that the LSP therefore regularly records radio communications.

The Plaintiffs have also requested any call logs or radio logs from the evening of October 7, 2017. They question LSP's position that no radio log exists because the Complaints and Administrative Investigations policy specifically identifies "radio logs" as documents to be gathered during the course of investigation.

LSP responds that its preliminary investigation indicated there were no radio communications, but after the subpoena was served, additional investigation revealed the sole recording that has now been produced. LSP describes its efforts to locate recordings. Counsel for

LSP asked the Captain of New Orleans Troop N to search for records. He contacted the radio communications section that maintains LSP radio recordings and found the single record. Bruce Coleman of Region 1 radio communications was also asked to search for calls related to the Lyle Dotson arrest, and he listened to each call on the Troop B radio 2 line and identified one as related to the Dotson arrest, which was then produced. LSP further explains that its detectives do not operate on recorded lines and that any communications with detectives would not have been recorded. LSP also says that when assigned to the New Orleans detail, the troopers did not operate on the Troop B line, but instead operated on the New Orleans Police Department channel through NOPD dispatch. LSP says that any radio logs related to the New Orleans detail would be maintained by NOPD. In conclusion, LSP argues that it is part of the normal discovery process that not everything is discovered at once. It insists that there has been no intent by LSP or Defendants to hide documents. It adds that the LSP's placement in the French Quarter was an unusual circumstance and "pieced together from various portions of LSP to fill a need." It argues that "[t]he documentation may not be what plaintiffs' counsel expect to be there, but that does not mean that LSP is lying or hiding documents."

The Court is satisfied with LSP's explanation regarding its search for radio recordings and logs as it pertains to the arrest of Dotson. However, LSP does not address whether it searched for recordings related to the earlier "Jackson Square" arrest. The Court finds that such recordings may also be relevant to the Plaintiffs' claims. Accordingly, LSP shall conduct a further search to locate any recordings in its possession that relate to the earlier Jackson Square arrest to which the Plaintiffs refer.

*d. Desk Log*

Plaintiffs requested that LSP produce information regarding troopers assigned to work in the French Quarter on the evening of October 7, 2015. LSP responded by providing a desk log purporting to cover the period from 6am to 6pm on that day. Of course, that time period would not cover the time period of the incident. Further, Plaintiffs say that the log lists only defendant Anderson on the log. They question LSP's position that no other desk log exists, noting that the LSP's Administration policy mandates the maintenance of a desk log reflecting the status of all personnel on shift.

LSP responds that although the desk log references 6am to 6pm, it is the only desk log that exists for that date and actually covers the shift for the detail that night, which was 3pm to 3am. LSP says that the desk log only allows for two shift entries, 6am to 6pm and 6pm to 6am, but the New Orleans detail was only one shift per day. The desk log did not allow for the entry of 3pm to 3am, so the person maintaining the shift log would have to choose either 6am to 6pm or 6pm to 6am. LSP claims that the desk log does indeed reflect the presence of Journee in addition to Anderson. LSP says that McCartney was also working on patrol and his name should be on the log, although it is not. LSP says it does not deny he was working. Finally, LSP explains that Bodet was working with detectives on October 7, 2015, and detectives are not entered into the desk log, nor do they maintain a desk log.

In light of LSP's explanation, the Court is satisfied that LSP has produced the documents that exist. As to the desk log, the Motion to Compel is denied.

## Conclusion

For the foregoing reasons, Plaintiffs' Motion to Compel is GRANTED in part. Within 14 days, the LSP shall perform and complete a search for any recordings of communications on the

evening of October 7, 2015, related to the "Jackson Square" arrest referred to in the Plaintiffs' motion and produce responsive material to the Plaintiffs. As to all other documents and information, the Motion to Compel is DENIED.

New Orleans, Louisiana, this  13th  day of October, 2017.

_____
Janis van Meerveld
United States Magistrate Judge