## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LYLE DOTSON, ET AL.,**<br>    **Plaintiffs** | **CIVIL ACTION** |
| **VERSUS** | **NO.  16-15371** |
| **COL. MICHAEL EDMONSON, ET AL.,**<br>    **Defendants** | **SECTION: "E" (1)** |

## ORDER AND REASONS

Before the Court is Defendants' motion for partial summary judgment that Defendants are entitled to qualified immunity on the claims of Plaintiff Lyle Dotson.[1] Plaintiff opposes the motion.[2] Defendants filed a reply to Plaintiff's opposition.[3] On order of the Court, Plaintiff filed a supplemental memorandum on December 13, 2017.[4]

## BACKGROUND

The allegations in the complaint are as follows. On October 7, 2015, Professor Olon Dotson, his son Lyle ("Plaintiff"), and several of Professor Dotson's students stopped in New Orleans during an architecture tour through the South.[5] When they reached New Orleans, Professor Dotson dropped his students off in the French Quarter while he went to check into their hotel.[6] After a brief visit at Café du Monde, the group of students walked to Pat O'Brien's, a popular bar and tourist attraction, where they intended to view the architecture of the interior courtyard.[7] Because the Plaintiff was eighteen years old at

---

[1] R. Doc. 75.
[2] R. Doc. 97. *See also* R. Doc. 108 (Plaintiff's response to Defendants' statement of uncontested material fact).
[3] R. Doc. 99.
[4] R. Doc. 112.
[5] R. Doc. 1 at 5.
[6] *Id.* at 5-6.
[7] *Id.* at 6.

the time, he did not go into Pat O'Brien's. They made a plan for Plaintiff to meet up with the students when the group exited through the other side of the bar.[8] Plaintiff got lost while making his way there.[9] He ultimately ended up near the intersection of Bourbon Street and Toulouse Street.[10] When the group emerged from Pat O'Brien's and did not immediately find Lyle, they called his father, who then called Plaintiff.

The following facts are undisputed. Around the same time the tour group left Café du Monde, undercover Louisiana State Police ("LSP") officers conducted a drug buy operation in the vicinity of St. Louis Cathedral in the French Quarter.[11] Defendant Rene Bodet, a Louisiana State Trooper, was a member of a "cover" team, assigned to watch the undercover troopers who were posing as drug buyers.[12] After the buy, while walking through the streets of the French Quarter, Trooper Bordelon, another member of the cover team, reported a potential "shadow"—a person following the undercover troopers who made the drug buy to determine whether they were police officers.[13] Trooper Bordelon gave a description of this "shadow" to Sergeant Sinanan, the head of the cover team, who instructed the undercover troopers to change direction prior to reaching the entrance to Pat O'Brien's.[14] A short time later, Bodet saw Plaintiff outside the Tropical Isle bar, which served as a safe location for the undercover team. According to testimony by Defendant Huey McCartney, Trooper Bodet then sought the assistance of several uniformed Louisiana State Police troopers—Defendants McCartney, Calvin Anderson,

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] R. Doc. 75-3 at ¶ 22. R. Doc. 108 at ¶ 22.
[12] R. Doc. 75-3 at ¶ 23. R. Doc. 108 at ¶ 23.
[13] R. Doc. 75-3 at ¶ 24-25. R. Doc. 108 at ¶ 24-25.
[14] R. Doc. 75-3 at ¶ 26. R. Doc. 108 at ¶ 26.

and Tagee Journee—to stop and detain Plaintiff in order to positively identify him and determine whether he was in fact following the officers.[15]

While Plaintiff was speaking on his cell phone with his father, Plaintiff was approached by Defendants McCartney, Anderson, and Journee.[16] His back turned to the officers, Plaintiff did not see them approach or hear them identify themselves.[17] The Troopers immediately handcuffed Plaintiff and took his cell phone.[18] Officers Journee and McCartney asked Plaintiff where he was from, and if he would consent to a pat down.[19] Plaintiff consented to Officer McCartney's request to take Plaintiff's wallet from his back pocket for identification.[20] Officer McCartney then verified Plaintiff's Indiana driver's license. After receiving confirmation of Plaintiff's identity, McCartney returned to the plainclothes officers to inform them that "we're going to cut [Plaintiff] loose."[21] Bodet then asked Trooper McCartney to take a picture of Plaintiff,[22] and Trooper McCartney returned to where Plaintiff was being detained by Troopers Anderson and Journee.[23] Trooper McCartney asked to take Plaintiff's picture, but Plaintiff did not give consent.[24] Trooper McCartney nonetheless persisted in taking Lyle's picture, and Lyle became agitated.[25]

The parties dispute much of what happened next. According to Defendants, Trooper McCartney testified that, in attempting to block McCartney from taking his

---

[15] R. Doc. 84-9, Deposition of Huey McCartney at 123.
[16] R. Doc. 75-3 at ¶ 4. R. Doc. 108 at ¶ 4.
[17] R. Doc. 75-3 at ¶ 4. R. Doc. 108 at ¶ 4.
[18] R. Doc. 75-3 at ¶ 5-6. R. Doc. 108 at ¶ 5-6. *See also* R. Doc. 97-11 (Deposition of C. Anderson) at 121:12-16.
[19] R. Doc. 75-3 at ¶ 7. R. Doc. 108 at ¶ 7.
[20] R. Doc. 75-3 at ¶ 12. R. Doc. 108 at ¶ 12.
[21] R. Doc. 75-3 at ¶ 40. R. Doc. 108 at ¶ 40.
[22] R. Doc. 75-3 at ¶ 40. R. Doc. 108 at ¶ 40.
[23] R. Doc. 75-3 at ¶ 41. R. Doc. 108 at ¶ 41.
[24] R. Doc. 75-3 at ¶ 14. R. Doc. 108 at ¶ 14.
[25] R. Doc. 75-3 at ¶ 22. R. Doc. 108 at ¶ 22.

picture, Plaintiff kicked McCartney.[26] Trooper Anderson corroborates this account, testifying that he saw contact between Plaintiff's leg and McCartney's leg.[27] Trooper Journee testified that he did not see Plaintiff kick McCartney, but because of the movements Lyle made attempting to evade the photograph, contact between Lyle and McCartney was possible.[28] Plaintiff, to the contrary, asserts he did not kick McCartney.[29] In any event, the parties agree that Plaintiff was subsequently placed under arrest for battery against an officer, and the Troopers walked him to the New Orleans Police Eighth District Station.[30] While walking to the station, the officers tightened Plaintiff's handcuffs, leaving marks on his wrists and causing numbness in his fingers.[31] Plaintiff filed suit in this Court on October 7, 2016.[32] Plaintiff asserts claims against Troopers McCartney, Anderson, Bodet, and Journee, as well as Colonel Edmonson, the Superintendent of Louisiana State Police.[33]

With respect to the Defendant Troopers, Plaintiff asserts causes of action under 42 U.S.C. § 1983 for violations of Lyle's rights under the Fourth and Fourteenth Amendments to the Constitution.[34] Plaintiff claims the troopers (1) unlawfully stopped him without reasonable suspicion; (2) used handcuffs during the investigatory stop, thereby converting the stop into unlawful arrest without probable cause; (3) exceeded the scope of the stop by continuing to detain him after his identify had been verified; (4) arrested

---

[26] R. Doc. 75-3 at ¶ 42.
[27] R. Doc. 75-3 at ¶ 22.
[28] R. Doc. 75-3 at ¶ 22.
[29] R. Doc. 108 at 22, 42.
[30] R. Doc. 75-3 at ¶ 16. R. Doc. 108 at ¶ 16.
[31] R. Doc. 75-3 at ¶ 16-18. R. Doc. 108 at ¶ 16-18.
[32] R. Doc. 1.
[33] *See* R. Doc. 112-1 (Supplemental Chart of Plaintiff's Claims). Plaintiffs named Donavan Archote as Defendant in the Complaint, but the parties later stipulated as to the dismissal of Mr. Archote as party in this case. R. Doc. 64.
[34] R. Doc. 1. and 112-1.

him for battery on an officer without probable cause; and (5) used excessive force in tightly handcuffing Lyle during the walk to the Eighth District police station.[35] Plaintiffs also raise Louisiana state law claims for assault and battery and false imprisonment against the Defendant Troopers.[36]

With regard to Defendant Edmonson, Plaintiff's remaining claim is based on a theory of supervisory liability under 42 U.S.C. § 1983 and the Fourth, Ninth, and Fourteenth Amendments.[37]

Defendants now move for summary judgment based on qualified immunity.[38] Defendants concede that a genuine issue of material fact exists as to whether Trooper McCartney reasonably believed he had probable cause to arrest Lyle, and as a result do not seek summary judgment on that claim.[39]

## LAW AND ANALYSIS

Defendants seek summary judgment that the Defendants are entitled to qualified immunity. "Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right."[40] As explained by the United States Supreme Court, "qualified immunity seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability."[41] In essence, qualified immunity

---

[35] *See* R. Doc. 112.
[36] R. Doc. 1. R. Doc. 112-1.
[37] R. Doc. 1 at 25. Plaintiff conceded that Edmonson cannot be held liable in his individual capacity for state law torts on a theory of respondeat superior. *See* R. Doc. 133. At oral argument, the Court granted summary judgment on Plaintiff's state law claim against Edmonson for intrusion on right to privacy and false light. *See* R. Doc. 129. *Id*. at 2. At oral argument the Plaintiff also moved to dismiss any and all claims under the First and Eighth Amendments. *See* R. Doc. 129. *See also* R. Doc. 112-1.
[38] R. Doc. 67.
[39] R. Doc. 76-1 at 7.
[40] *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). *See also Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[41] *United States v. Lanier*, 520 U.S. 259, 570 (1997) (internal quotation marks and citations omitted).

"avoid[s] excessive disruption of government" by permitting officials to exercise their vested discretion without fear of civil liability."[42]

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[43] "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'"[44]

Once a defendant raises a qualified immunity defense in a motion for summary judgment, the burden then shifts to the plaintiff to rebut the defense by establishing that a genuine issue of material fact exists as to whether the official's allegedly wrongful conduct violated established law.[45] First, a plaintiff must allege that the defendant violated his clearly established constitutional rights.[46] Second, if the plaintiff has shown such a violation, the court "must consider whether [the defendant's] actions were objectively reasonable under the circumstances."[47] "That is, [the] [c]ourt must decide whether reasonably competent officers would have known that their actions violated law which was clearly established at the time of the disputed action."[48] According to the Fifth Circuit:

---

[42] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
[43] *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 391 (5th Cir. 2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).
[44] *Id.* (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).
[45] *Michalik v. Hermann*, 422 F.3d 252, 257-58 (5th Cir. 2005).
[46] *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004) (citing *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S.Ct. 2508 (2002)); *see also Brown v. Bolin*, 2012 WL 6194359, at *3 (5th Cir. Dec. 12, 2012); *Hinojosa v. Johnson*, 277 Fed. App'x 370, 374 (5th Cir. 2008).
[47] *Collins*, 382 F.3d at 537 (citing *Bazan*, 246 F.3d at 490); *Brown*, 2012 WL 6194359, at *3; *Hinojosa*, 277 Fed. App'x at 374.
[48] *Collins*, 382 F.3d at 537 (citing *Bazan*, 246 F.3d at 490).

> [a] defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff. The "defendant's circumstances" includes facts known to the defendant. However, because qualified immunity turns only upon the objective reasonableness of the defendant's acts, a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity. An official is eligible for qualified immunity even if the official violated another's constitutional rights.[49]

"Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury."[50]

The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact exist regarding the objective reasonableness of the officers' conduct.[51]

## I. Trooper Defendants

### A. <u>*Terry* Stop Without Reasonable Suspicion</u>

The Trooper Defendants argue on summary judgment that they are entitled to qualified immunity on this claim.[52] Plaintiff alleges that Defendants Bodet, McCartney, Anderson, and Journee violated his Fourth Amendment rights by detaining him during an investigatory stop without reasonable suspicion. It is well-established that, pursuant to *Terry v. Ohio*, police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot.[53] Reasonable suspicion requires "the police officer . . . to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that

---

[49] *Thompson*, 245 F.3d at 457 (citations omitted).
[50] *Brown*, 623 F.3d at 253 (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)).
[51] *Michalik v. Hermann*, 422 F.3d 252, 257-58 (5th Cir. 2005).
[52] R. Doc. 75-1 at 35.
[53] *Terry v. Ohio*, 392 U.S. 1, 30 (1968). *See also United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).

intrusion."[54] "The presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time of the decision to stop a person."[55] Because Plaintiff claims the officers detained him without reasonable suspicion, he has alleged a violation of a clearly established right.

Defendants assert their conduct was objectively reasonable under the law at the time of the incident. According to the Trooper Defendants, Plaintiff "was stopped in the French Quarter in a crowded, high crime area under reasonable suspicion that he may have presented a threat to an undercover officer."[56] Defendants further argue that McCartney, Anderson, and Journee are entitled to rely on the collective knowledge of other officers, including Sergeant Sinanan and Trooper Bordelon, who testified that they observed a person following the undercover team.[57] Defendant Bodet testified that Lyle matched the description of the shadow as reported by Sinanan and Bordelon.[58]

In response, Plaintiff submits evidence he claims demonstrates that genuine issues of material fact exist with respect to the reasonableness of the officers' conduct. Specifically, Plaintiff points to disputed facts with respect to the fundamental reason for the stop—that he was following the undercover officers. In Plaintiff's account of his actions in the period between his sighting outside Pat O'Brien's and his sighting outside Tropical Isle, he describes a different route from the one taken by the Troopers, and, as a result, he argues the troopers could not have seen him following them. Troopers Bordelon and Bodet testified that the "potential shadow" proceeded in a *clockwise* manner, walking

---

[54] *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir.2009).
[55] *United States v. Silva*, 957 F.2d 157, 160 (5th Cir. 1992).
[56] R. Doc. 75-1 at 34.
[57] *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013).
[58] R. Doc. 75-5 at 11.

northwest on St. Peter Street to the entrance of Pat O'Brien's, then doubling back and turning southwest onto Royal Street, then a right onto Toulouse Street, and then another right onto Bourbon.[59] Plaintiff, on the other hand, testified that he proceeded in a *counterclockwise* manner, walking northwest on St. Peter Street, then a left onto Bourbon Street, then southwest to Toulouse Street where he took a left, then back to Bourbon.[60] The routes described are mirror opposites. This dispute undermines the core of Defendants' basis for reasonable suspicion, as it suggests that Plaintiff, rather than following the undercover team, just happened to be seen in two places along their route.

There also is a genuine dispute as to whether it was reasonable to identify Lyle as the "shadow" in the first place. Trooper Bordelon initially reported the "shadow" was walking alone.[61] However, Plaintiff provided testimony that Lyle was walking with a group and close beside a faculty advisor, Professor Keddy, during the walk from Jackson Square to Pat O'Brien's:

> We walked past the cathedral in Jackson Square. I was walking next to Lyle, with him on my right. Because of my hearing problems, Lyle had to walk closely to me so that we could carry on a conversation. . . During practically the entire time we walked the short distance from Café du Monde to Pat O'Brien's, Lyle and I were in conversation.[62]

Furthermore, although Trooper Bodet testified he saw the alleged shadow walking past the cover team near Pat O'Brien's, the parties dispute whether the person Trooper Bodet saw was Lyle Dotson.[63]

---

[59] R. Doc. 94-10 at 125-30.
[60] R. Doc. 94-9 at 21-26.
[61] R. Doc. 97-7 at 120; R. Doc. 97-9 at 140.
[62] R. Doc. 94-4 (Declaration of Karen Keddy).
[63] R. Doc. 75-3 at ¶ 27. R. Doc. 108 at ¶ 27.

Significant discrepancies exist between Plaintiff's and Defendants' accounts of the conduct which purportedly justified the investigative stop.[64] As a result, the Court finds there are genuine disputes of material fact with respect to the objective reasonableness of the officers' conduct.[65] Accordingly, the Court denies summary judgment on the issue of whether the officers are entitled to qualified immunity for the investigatory stop.[66]

**B.**   Unlawful Application of Handcuffs

Defendants argue on summary judgment that they are entitled to qualified immunity on Plaintiff's claim regarding the use of handcuffs during the investigatory stop.[67] The use of handcuffs, Plaintiff argues, was an unjustified application of force that converted the investigatory stop into an arrest for which Defendants did not have probable cause. An investigatory stop rises to the level of an arrest only "if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[68] Handcuffing a suspect does not automatically convert an investigatory detention into an arrest requiring probable cause, but the use of such force must be

---

[64] In addition to the factual disputes cited above, the parties do not agree on the extent of information shared regarding the description of the shadow; whether Lyle was actually pointed out by one officer to another, and if so, by whom and when; whether the shadow seen at Jackson Square by Bordelon was Lyle; whether there were other individuals in the area who matched the description of the shadow; and whether the person Defendant Bodet saw near Pat O'Brien's was the same person he saw outside the Tropical Isle.

[65] To be clear, the Court is not making a determination at this stage that the officers are not entitled to qualified immunity. The Court's ruling is only that genuine issues of material fact preclude the Court from making such a determination.

[66] The Fifth Circuit has jurisdiction to review a district court's denial of summary judgment with respect to qualified immunity "only to the extent that the appeal concerns the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record." *Hamilton*, 845 F.3d at 661 (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004)). The Fifth Circuit "lack[s] the power to review the district court's decision that a genuine factual dispute exists and instead consider[s] only whether the district court erred in assessing the legal significance of conduct that the district court deemed sufficiently supported." *Id.* (internal quotations omitted).

[67] R. Doc. 75-1 at 35.

[68] *Carroll v. Ellington*, 800 F.3d 154 (5th Cir. 2015).

objectively reasonable under the circumstances.[69] The Fifth Circuit looks to whether the police were unreasonable in failing to use less intrusive measures to safely conduct their investigation.[70] If the suspect is pursued for an armed offense, or if the officer detects a bulge in the suspect's pocket after frisking him, the officer's use of handcuffs may be reasonable.[71] The Court must determine "case by case whether the police were unreasonable."[72] In this case, because Plaintiff claims the officers' use of force converted the stop into an arrest for which the officers did not have probable cause, the Plaintiff has alleged a violation of a clearly established constitutional right.

In their motion for summary judgment, Defendants assert they are entitled to qualified immunity on the use of handcuffs because the officers' conduct was objectively reasonable. Defendants argue "Lyle Dotson was stopped in the French Quarter in a crowded, high crime area under reasonable suspicion that he may have presented a threat to an undercover officer."[73]

In response, Plaintiff argues there are disputed facts with respect to whether Lyle presented a security risk. Defendant Anderson testified that he and Journee stopped Lyle based solely on the instructions of other officers.[74] Defendants Anderson and Journee had no independent reason for detaining Lyle.[75] At the time Lyle was stopped, he was on the

---

[69] *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993).

[70] *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000).

[71] *See United States v. Campbell*, 178 F.3d 345 (5th Cir. 1999); *United States v. Abdo*, 2012 WL 12885241 at *5 (W.D. Tex. May 1, 2012).

[72] *United States v. Sanders*, 994 F.2d 200, 206-07 (5th Cir. 1993). The evidence put forth by Plaintiff—that Lyle was cooperative when the stop began, that there was no individualized suspicion that he was armed, and that he was not attempting to flee the area—distinguishes this case from the investigative stops in *Sanders* and *Campbell*, because in this case it is not clear the Defendant Troopers had any specific reason to believe the Plaintiff was armed, and Plaintiff gave no indications of aggression or flight from the scene. *See United States v. Campbell*, 178 F.3d 345 (5th Cir. 1999); *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993).

[73] R. Doc. 75-1 at 34. Defendants do not, however, assert any factual basis for the statement that the French Quarter was crowded at the time.

[74] R. Doc. 75-8 at 1.

[75] R. Doc. 75-8 at 1.

phone, walking away from the Defendants in a non-evasive manner.[76] Lyle was not brandishing a weapon, and the Defendants had not received any information that he was armed, or that he was wanted for an armed offense.[77] Lyle and Defendant Journee both testified that Lyle was initially calm and cooperative.[78] Further, Anderson testified he was not aware of the reason for stopping Lyle until after Lyle was handcuffed.[79] Nevertheless, Plaintiff testified he was handcuffed within "three seconds" of making initial contact with the Defendant Troopers.[80] Because Anderson and Journee had no independent reason for believing the Plaintiff presented a threat, the only possible basis for handcuffing the Plaintiff would be because the officers who observed the shadow believed he presented a threat because he was following them.

As described above, factual disputes exist with respect to whether Lyle was following the undercover troopers.[81] These factual disputes also preclude summary judgment with respect to whether the officers' use of handcuffs was objectively reasonable.

Accordingly, the Court denies summary judgment on the issue of whether the officers are entitled to qualified immunity with respect to Plaintiff's claim that the use of handcuffs converted the stop into an arrest without probable cause.[82]

---

[76] R. Doc. 97-11 at 100 ("I don't believe the person was looking at us. So got his attention. Like, I believe he may have been walking away from us, but not intentionally. Like, he wasn't trying to evade or anything, but I don't think he was walking toward me. So stopped him").

[77] *Id.* at 106 ("Q: Had you been provided any information leading to this stop regarding this person being armed? A: No. I told you, I was just told to stop the person.").

[78] *Id.* at 102 ("Q: Can you describe that initial physical contact that you made with this person? A: I remember it being normal. I remember the person being, like, cooperative. I don't remember any hostility or anything.").

[79] R. Doc. 75-1 at 1 (Q. So what is your understanding of the basis for y'all stopping this person? A. I was told after the fact, but initially, I wasn't initially told what we were stopping him for."

[80] R. Doc. 70-3 at 4.

[81] *See supra* Section I.A.

[82] As with the Court's finding regarding Defendants' claim of qualified immunity as to Plaintiff's unlawful-investigative-stop claim, the Court is not making a determination at this stage that the officers are not

C. <u>Unreasonable Seizure By Continued Detention Without Reasonable Suspicion</u>

Defendants argue they are entitled to qualified immunity on this claim. Plaintiff alleges that Defendants McCartney, Anderson, and Journee unlawfully seized him by continuing to detain him after any reasonable suspicion had dissipated in order to take his photograph. "A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."[83] "[W]hen an officer stops a person based on reasonable suspicion of some crime, the officer may detain that person for only long enough to investigate that crime. Once the purpose justifying the stop has been served, the detained person must be free to leave."[84] A detention may be extended, however, if the officer has a "reasonable suspicion supported by articulable facts" that the subject is involved in some other illegal activity.[85] A reviewing court "must look at the totality of the circumstances and consider the collective knowledge and experience of the officers involved."[86] Because the Plaintiff alleges the Defendants detained him after reasonable suspicion, if any ever existed, had dissipated, he has alleged a violation of a clearly established right.

Defendants assert they are entitled to qualified immunity because "[i]t is not clearly established as a matter of law that law enforcement officers are not permitted to take a photograph of a detainee during an otherwise permissible stop."[87] Defense counsel elaborated their position during oral argument, asserting that the continued detention of Plaintiff while Defendant McCartney attempted to photograph Plaintiff did not constitute

---

entitled to qualified immunity. The Court's ruling is only that genuine issues of material fact preclude the Court from making such a determination.

[83] *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015).
[84] *United States v. Machuca-Barrera*, 261 F.3d 425, 432 (5th Cir. 2001).
[85] *United States v. Solis*, 61 F. App'x 923 (5th Cir. 2003).
[86] *Id.*
[87] R. Doc. 75-1.

an independent violation of the Fourth Amendment. Under Defendants' view, the brief period during which McCartney attempted to take the photograph was a part of the overall investigatory stop for which the Officers had reasonable suspicion, rather than a separate detention requiring a distinct showing of reasonable suspicion. As a result, Defendants assert they are entitled to qualified immunity because Plaintiff has not alleged a violation of a clearly established constitutional right.

It is clearly established that Plaintiff has a right not to be subjected to a *Terry* stop absent reasonable suspicion.[88] Even accepting the Defendants' theory that the period of time after McCartney verified Plaintiff's identify, and during which the Trooper Defendants tried to take Lyle's photograph, falls within the initial investigatory stop, Plaintiff has alleged the violation of a clearly established right not to be detained longer than necessary to complete the investigation.

As the Court explained above, Plaintiff has established that there are genuine disputes of material fact as to the objective reasonableness of the officers' actions during the *Terry* stop. Accordingly, the Court finds that disputes of fact also exist as to the reasonableness of the continued detention of Plaintiff while the Trooper Defendants attempted to take his photograph. These disputed facts preclude summary judgment on Defendants' qualified immunity defense.

D.    Unlawful Arrest for Battery Against an Officer

Defendants argue they are entitled to qualified immunity on Plaintiff's claim that the Defendants arrested him for battery without probable cause. A warrantless arrest without probable cause violates clearly established law defining an individual's Fourth

---

[88] *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).

Amendment rights.[89] Probable cause "means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[90] Plaintiff has alleged a violation of a clearly established constitutional right.

Defendants concede that disputed issues of material fact preclude summary judgment that Defendant McCartney is entitled to qualified immunity as to the unlawful arrest claim, but argue that Defendants Anderson, Journee, and Bodet are nonetheless entitled to qualified immunity on the unlawful arrest claim because they were not Plaintiff's arresting officers. It is well-settled in the Fifth Circuit, however, that a non-arresting officer may be liable for the false arrest of a civilian where the non-arresting officer has knowledge that the arrest is made without probable cause, has a reasonable opportunity to prevent the harm, and chooses not to act.[91] As a result, Defendants Anderson, Journee, and Bodet are not entitled to qualified immunity on summary judgment if Plaintiff has provided evidence creating a genuine dispute of material fact as to whether they were aware the arrest was made without probable cause, had an opportunity to prevent the harm, and chose not to act.

The Court finds the Plaintiff has provided facts that create a genuine dispute of material fact as to the objective reasonableness of the officers' conduct. Specifically, Plaintiff points to testimony indicating that the Troopers did not have a reasonable basis for believing that probable cause existed to arrest the Plaintiff on a charge of battery on

---

[89] See *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013).
[90] *Hogan*, 722 F.3d at 731 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).
[91] R. Doc. 97 at 23 (citing *Whitely v. Hanna*, 725 F.3d 631, 646-47 (5th Cir. 2013)).

an officer. Plaintiff testified he did not kick Trooper McCartney.[92] Trooper Journee testified that he did not see Lyle kick McCartney, but because of the movements Lyle made attempting to evade the photograph, contact between Lyle and McCartney was possible.[93] Journee further testified he did not "think [Plaintiff] was maliciously trying to do anything."[94] Trooper Anderson testified that he saw contact between Lyle's leg and McCartney, but also testified that any contact was not intentional, and was merely a consequence of the Plaintiff attempting to avoid having his photograph taken.[95] Clearly, whether Lyle kicked McCartney is a disputed issue of fact bearing on whether probable cause existed for the arrest.

The testimony of Defendants Anderson and Journee indicates that, even if contact between the Plaintiff and Defendant McCartney occurred, they did not believe that it was intentional. Under Louisiana law, battery is the "*intentional* use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another.[96]

The factual disputes with respect to whether Plaintiff kicked McCartney, and whether Lyle had the necessary intent under Louisiana law, call into question whether it was reasonable for Anderson, Journee, and Bodet to believe there was probable cause to arrest the Plaintiff. Accordingly, the Court denies summary judgment on qualified immunity.[97]

---

[92] R. Doc. 84-3, Deposition of Lyle Dotson at 63.

[93] R. Doc. 75-3 at ¶ 22. R. Doc. 108 at ¶ 22.

[94] R. Doc. 97-12 at 119.

[95] R. Doc. 97-11 at 121.

[96] La. R.S. 14:33.

[97] The Fifth Circuit has jurisdiction to review a district court's denial of summary judgment with respect to qualified immunity "only to the extent that the appeal concerns the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record." *Hamilton*, 845 F.3d at 661 (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004)). The Fifth Circuit "lack[s] the power to review the district court's decision

E.    Excessive Force

Defendants move for summary judgment that they are entitled to qualified immunity on Plaintiff's excessive force claim. Defendants assert they are entitled to qualified immunity because the Plaintiff failed to show more than a *de minimis* injury, and thus has not properly alleged a violation of the Fourth Amendment.[98] In support, Defendants put forward undisputed facts that Plaintiff did not seek medical attention as a result of the handcuffing, and that any numbness in Lyle's wrist had ended by the time he reached the station.[99]

The Fourth Amendment grants individuals the right to be free from unreasonable search and seizure, including the right to be free from the use of excessive force by law enforcement.[100] In the Fifth Circuit, to succeed on an excessive force claim, the plaintiff bears the burden of showing: "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable."[101] With regard to the injury requirement, the Fifth Circuit has held that although the Plaintiff "need not show a significant injury, he must have suffered at least some injury."[102] Moreover, the Fifth Circuit has repeatedly affirmed that "handcuffing too tightly, without more, does not amount to excessive force."[103]

---

that a genuine factual dispute exists and instead consider[s] only whether the district court erred in assessing the legal significance of conduct that the district court deemed sufficiently supported." *Id.* (internal quotations omitted).

[98] R. Doc. 75-1 at 33.

[99] R. Doc. 75-2 at ¶ 17-18; R. Doc. 108 at ¶17-18. Plaintiff's counsel confirmed at oral argument that the excessive force claim was limited to Defendants' application of handcuffs.

[100] *Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996).

[101] *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000).

[102] *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993).

[103] *See, e.g., Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005); *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).

The Court finds Plaintiff has failed to provide evidence sufficient to show a constitutional violation, and Defendants are entitled to qualified immunity. Plaintiff's opposition to the motion for summary judgment states that the handcuffs left "marks like a scar after getting cut on Lyle's wrist," and that "the handcuffs were too tight and he could not feel the tips of his fingers."[104] However, Plaintiff has not provided any evidence indicating he sustained any harm other than that typically associated with being handcuffed during an arrest. He did not seek medical treatment as a result of his arrest, and as a result is unable to submit medical evidence in support of his claim.[105] The Fifth Circuit has held "the amount of injury required to prevail in an excessive force action depends on the context in which the injury occurs . . .[but] this circuit currently requires a plaintiff to have suffered at least some injury."[106] Given these facts, the Court concludes that any injury sustained by the Plaintiff is *de minimis*, and therefore does not rise to the level of a constitutional violation.[107]

Because Plaintiff has failed to allege a violation of a clearly established constitutional right, Defendants are entitled to summary judgment on their defense of qualified immunity with respect to Plaintiff's claim for excessive force pursuant to 42 U.S.C. § 1983.

F.    State Law Claims

Defendants move for summary judgment that they are entitled to qualified immunity with regard to Plaintiff's state law claims of assault and battery and false

---

[104] R. Doc. 97 at 30.
[105] *See Montes v. Ransom*, 219 Fed. Appx. 378 (5th Cir. 2007) ("[A]dmissible medical evidence establishing some injury is required to satisfy the injury requirement of an excessive force claim based on the application of handcuffs.").
[106] *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996).
[107] *See, e.g., Tarver*, 410 F.3d at 752.

imprisonment.[108] Because, as stated above, disputed issues of fact exist, Defendants are not entitled to judgment as a matter of law with regard to Plaintiff's state law claims.

## VII.    Claims Against Defendant Edmonson

A.    <u>Supervisory Liability</u>

Plaintiff also brings a § 1983 claim against Defendant Michael Edmonson, who at the time of Plaintiff's arrest was Superintendent of the Louisiana State Police.[109] Although Defendant Edmonson was not directly involved in the actual stop and arrest of Lyle Dotson, Defendant Edmonson may be subject to supervisory liability under § 1983. Plaintiff argues Defendant Edmonson is liable under three theories. First, Plaintiff claims Defendant Edmonson is liable for failing to train or supervise the Defendant Troopers.[110] Specifically, Plaintiff asserts Edmonson failed to properly train LSP officers in how to appropriately conduct pedestrian investigatory stops, and did not adequately train LSP officers in community policing and cross-racial identification. According to Plaintiff, these gaps in the Defendants Troopers' training led directly to the alleged constitutional violations.[111]

Second, Plaintiff claims Defendant Edmonson is liable under § 1983 for establishing unconstitutional policies that led to Plaintiff's injuries.[112] Plaintiff alleges that Defendant Edmonson, as a policymaker for the Louisiana Police, "acted to violate Lyle's rights by establishing and maintaining policies, customs, usages, practices, and procedures that [he] knew would deprive the public, including Lyle Dotson, of their

---

[108] *See* R. Doc. 112-1.
[109] R. Doc. 1 at 3.
[110] R. Doc. 97 at 25.
[111] R. Doc. 97 at 30.
[112] R. Doc. 97 at 26.

constitutional rights."[113] As described by the Plaintiff, Defendant Edmonson had "active involvement in LSP French Quarter operations," and he played a public role in establishing the guidelines of LSP engagement in the French Quarter—guidelines which promoted an aggressive, hands-on style of policing.[114]

Third, Plaintiff claims Defendant Edmonson deliberately failed to implement policies that would have safeguarded against the kind of conduct alleged by Plaintiff. Citing *Rhyne v. Henderson*[115] and *Porter v. Epps*,[116] Plaintiff asserts Edmonson's failure to adopt certain policies "amounts to deliberate indifference," warranting supervisory liability under § 1983.[117]

Defendants seek summary judgment that Defendant Edmonson is entitled to qualified immunity with respect to all three claims. "Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right."[118] Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law.'"[119] Once a defendant raises a qualified immunity defense in a motion for summary judgment, the burden then shifts to the plaintiff to rebut the defense by establishing that a genuine issue of material fact exists as to whether the official's allegedly wrongful conduct violated established law.[120] First, a plaintiff must allege that the defendant violated his clearly established constitutional right.[121] Second, if the

---

[113] R. Doc. 1 at 25.
[114] R. Doc. 97 at 26.
[115] 973 F.2d 386, 392 (5th Cir. 1992).
[116] 659 F.3d 440, 446 (5th Cir. 2011).
[117] R. Doc. 143-2 at 2. *See also* R. Doc. 97 at 25; R. Doc. 112.
[118] *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). *See also Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[119] *Davidson*, 848 F.3d at 391. (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).
[120] *Michalik v. Hermann*, 422 F.3d 252, 257-58 (5th Cir. 2005).
[121] *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004) (citing *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S.Ct. 2508 (2002)); *see also Brown v. Bolin*, 2012 WL 6194359, at *3 (5th Cir. Dec. 12, 2012); *Hinojosa v. Johnson*, 277 Fed. App'x 370, 374 (5th Cir. 2008).

plaintiff has shown such a violation, the court "must consider whether [the defendant's] actions were objectively reasonable under the circumstances."[122] "That is, [the] [c]ourt must decide whether reasonably competent officers would have known that their actions violated law which was clearly established at the time of the disputed action."[123]

The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact exist regarding the objective reasonableness of the officers' conduct.[124]

With respect to the claim of supervisory liability, the alleged violations of constitutional rights center on the *Terry* stop, the continued detention, and the arrest, all without reasonable suspicion or probable cause. As discussed above, the Plaintiff has asserted violations of clearly established constitutional rights.

1.      *Failure to Train or Supervise*

Defendant moves for summary judgment that Edmonson is entitled to qualified immunity with respect to Plaintiff's claim of failure to train or supervise. In order to survive a § 1983 claim for supervisory liability for failure to train or supervise, a plaintiff must prove (1) the supervisor failed to supervise or train the subordinate officer; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and (3) the failure to train or supervise amounts to deliberate indifference.[125] Deliberate indifference is a "stringent standard of fault,"[126] requiring the plaintiff to show "that the official "disregarded a known or obvious consequence of his

---

[122] *Collins*, 382 F.3d at 537 (citing *Bazan*, 246 F.3d at 490); *Brown*, 2012 WL 6194359, at *3; *Hinojosa*, 277 Fed. App'x at 374.
[123] *Collins*, 382 F.3d at 537 (citing *Bazan*, 246 F.3d at 490).
[124] *Michalik v. Hermann*, 422 F.3d 252, 257-58 (5th Cir. 2005).
[125] *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 397 (5th Cir. 2017).
[126] *Id*

action."[127] Actions or decisions by officials "that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity."[128]

Edmonson argues that he is entitled to qualified immunity as a matter of law because Plaintiff will not be able to establish an essential element of his claim, that is, that the failure to train amounted to deliberate indifference. To satisfy the deliberate indifference prong, "a plaintiff must usually demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation."[129] "A showing of deliberate indifference requires that the [Plaintiff] show that the failure to train reflects a deliberate or conscious choice to endanger constitutional rights."[130] Alternatively, a plaintiff can establish deliberate indifference "based on a single incident if the constitutional violation was the highly predictable consequence of a particular failure to train."[131] Plaintiff does not argue deliberate indifference based on the single-incident theory. Instead, Plaintiff argues that "a pattern of similar violations" exists.

In support of his claim, Plaintiff provides evidence of three similar violations by LSP. First, Plaintiff references the 2013 incident involving the stop of Ferdinand Hunt and Sydney Newman, two young African-American males who were tackled by LSP officers in the French Quarter.[132] Second, Plaintiff points to the 2015 vehicular stop of

[127] *Id.*
[128] *Id.*
[129] *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375 (5th Cir. 2005).
[130] *Id.*
[131] *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 397 (5th Cir. 2017).
[132] R. Doc. 97 at 39.

musician Shamarr Allen.[133] Third, Plaintiff alludes to the allegedly unlawful stop of Michael Baugh, a New Orleans barber, by LSP officers in 2015.[134]

The Court finds that the three incidents put forth by the Plaintiff are insufficient to constitute a "pattern" in the Fifth Circuit, which requires the Plaintiff to show "similarity, specificity, and sufficiently numerous prior incidents."[135] First, Plaintiff has not alleged sufficiently numerous prior incidents. For example, in *Davidson v. City of Stafford, Texas*, the Fifth Circuit rejected a pattern-or-practice argument when the plaintiff had alleged only three similar cases in three-and-a-half years.[136] Similarly, the court found no pattern in twenty-seven complaints of excessive force over a four-year period in *Peterson v. City of Fort Worth, Texas*.[137] In *Pinea v. City of Houston*, the Fifth Circuit found no pattern in eleven incidents of warrantless searches.[138] In this case, Plaintiffs offers only the three examples of misconduct described above, which are not sufficiently numerous.[139]

Second, Plaintiff has not shown that all three incidents are sufficiently similar to the constitutional violation in this case to constitute a pattern of a specific violation. "Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question."[140] The three incidents put forth are similar in that they all involve alleged police misconduct against African-American males in New Orleans,

---

[133] R. Doc. 1 at 14-15.
[134] R. Doc. 1 at 16.
[135] *See, e.g.*, *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 396 (5th Cir. 2017) (rejecting a claim of pattern of practice where plaintiff alleges three cases in three and a half years); *Peterson v. City of Fort Worth, Tex.*, 588, F.3d 838 (5th Cir. 2009) (no pattern with twenty-seven complaints of excessive force over a four-year period).
[136] 848 F.3d 384, 396 (5th Cir. 2017).
[137] 588 F.3d 838 (5th Cir. 2009).
[138] 291 F.3d 325, 329 (5th Cir. 2002).
[139] *See* R. Doc. 97 at 25.
[140] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838 (5th Cir. 2009) (citing *Estate of Davis ex rel. McCully v. City of North Richland* Hills, 406 F.3d 375, 383 (5th Cir. 2005).

and in each case, the citizens alleged a claim of bias-based policing. However, there are significant differences between two of the incidents and the case now before the Court that weigh against finding a pattern of a specific constitutional violation. For example, the incident with the Plaintiff involved a pedestrian stop, while the incidents with Shamarr Allen and Michael Baugh both involved vehicular stops. Because much of Plaintiff's argument centers on the LSP's foot patrols in the French Quarter, allegations of wrongful vehicular stops do not "point to the specific violation in question."[141] The incident involving Ferdinand Hunt and Sydney Newman bears a greater resemblance to this case, in that both incidents alleged unlawful conduct by LSP officers on foot in the French Quarter against young African-American men. For the reasons stated above, however, Plaintiff is unable to establish a pattern by pointing to only one other similar incident.

Third, none of the three incidents cited by the Plaintiff was actually adjudged to be a constitutional violation. The Fifth Circuit has found that when a plaintiff only puts forward examples of prior misconduct in which the allegations have not actually been adjudicated to be constitutional violations, the court is less likely to find that a pattern exists.[142] LSP settled the claims of Ferdinand Hunt and Sydney Newman prior to trial, and Michael Baugh's claims against LSP are pending. Finding a pattern of constitutional violations based on these three examples would require the Court to independently examine each incident for constitutional infirmity, which the Fifth Circuit has instructed the Court not to do.[143]

---

[141] *Peterson*, 588 F.3d at 838.

[142] *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 396-96 n.6 (5th Cir. 2017). ("That we would have to consider whether each prior incident constitutes an unconstitutional arrest further cuts against a finding of a pattern.").

[143] *Id.* ("That we would have to consider whether each prior incident constitutes an unconstitutional arrest further cuts against a finding of a pattern.").

As a result, the Court finds Plaintiff has failed to create a genuine dispute of material fact as to whether Defendant Edmonson was deliberately indifferent based on his failure to train or supervise. Because this claim fails on the requirement of deliberate indifference, the Court need not address the other two prongs of the claim of failure to train or supervise.[144]

Accordingly, Defendant Edmonson is entitled to qualified immunity on Plaintiff's § 1983 claim for supervisory liability under a theory of failure to train or supervise.

2. *Implementation of Unconstitutional Policies*

Defendants move for summary judgment that Edmonson is entitled to qualified immunity with respect to Plaintiff's claim that Edmonson is liable for implementing an unconstitutional policy.

Supervisory officials may be liable under § 1983 "if [the] supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."[145] An official policy can be shown in two ways:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [government entity] . . . or by an official to whom the [entity] ha[s] delegated policy-making authority; or
> 2. A persistent, widespread practice of . . . officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [the entity's] policy.[146]

Defendants argue Edmonson is entitled to summary judgment because Plaintiff has not identified an officially adopted policy that is unconstitutional.[147] Plaintiff argues

---

[144] *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 382 (2005)
[145] *Cozzo v. Tangipahoa Par. Council--President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002).
[146] *Id.* (quoting *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).
[147] R. Doc. 75-1 at 26-27.

Edmonson has promoted a brand of aggressive policing that amounts to a "persistent, widespread practice" that is "so common and well settled as to constitute a custom."[148] At oral argument, Plaintiff's counsel described the relevant policy at issue in this case as the "tone" Defendant Edmonson set regarding pedestrian policing in the French Quarter. Plaintiff provided evidence to show that (1) Edmonson actively promoted a stop-and-frisk approach to policing;[149] (2) Edmonson has never been involved in or sought to terminate any trooper for violating the policy on biased-based policing;[150] and (3) Edmonson has defended troopers who have violated the LSP's biased-based profiling policy.[151] According to the Plaintiff, Edmonson's public statements and his deposition testimony show that he advocated an approach to policing that endorsed stop-and-frisk tactics and active investigation by officers on patrol. Edmonson described his approach to policy during his deposition: "[Y]ou're going to be aggressive when you are dealing with people that wish [to] threaten public safety. I think the public has to know that we mean that and criminals need to understand that we are going [to] aggressively encounter them."[152] Defendant Edmonson further testified that he supported LSP troopers who had been accused of racial profiling.[153]

Even accepting the argument that Defendant Edmonson's public statements and positions on internal investigations supported an atmosphere in which LSP troopers felt that they had institutional protection to engage in proactive police tactics, Plaintiff has failed to "establish the existence of a persistent, widespread practice of the Department's

---

[148] *See Cozzo*, 279 F.3d at 289.
[149] R. Doc. 97-15 at 150 (Deposition of Michael Edmonson).
[150] *Id.* at 92.
[151] *Id.* at 78, 83.
[152] R. Doc. 97-15 at 153.
[153] R. Doc. 97-15 at 78.

official or employees, which . . . [is] so common and well settled as to constitute a custom that fairly represents department policy."[154] As described above, Plaintiff has only alluded to three prior incidents of alleged racially biased policing. These incidents alone are not enough to show that Defendant Edmonson's position amounts to well-settled LSP policy.

Further, Plaintiff fails to provide sufficient evidence to create a dispute of fact with regard to whether Defendant Edmonson's conduct was the "moving force" behind the alleged deprivation of Plaintiff's constitutional rights. To prove that a supervisor's policy was the "moving force," "a plaintiff must show direct causation."[155] "This means there must be a direct causal link between the policy and the violation."[156] In this case, Plaintiff offers only a conclusory assertion that "Edmonson's testimony itself makes clear that Bodet, Anderson, Journee, and McCartney were following his direct lead in their stop and arrest of Lyle Dotson."[157] Plaintiff fails to raise a factual question as to whether Edmonson's stance on proactive policing was a but-for cause of the alleged violation, let alone the "moving force."[158] Edmonson's testimony only illustrates the contours of Edmonson's beliefs, and does not demonstrate in any way that the Defendant Troopers were motivated specifically by Edmonson's conduct.[159]

The Court finds Plaintiff has failed to provide sufficient evidence to make out an essential element of his claim because he has not shown the implementation of an

---

[154] *Cozzo v. Tangipohoa Parish Council-President Government*, 279 F.3d 273, 289-90 (5th Cir. 2002) (reversing district court's denial of qualified immunity when the plaintiff had failed to show evidence demonstrating that a sheriff's unofficial position amounted to an institution policy).

[155] *See Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009).

[156] *Id.*

[157] R. Doc. 97 at 29-33.

[158] *See Peterson*, 588 F.3d at 848 (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) ("must be more than a mere but for").

[159] R. Doc. 97 at 29-30. The Court also finds that Plaintiff's expert's assertion that "Troopers such as Bodet, Anderson, McCartney and Journee would reasonably conclude that their ultimate supervisor (Colonel Edmonson) would commend them for aggressively stopping pedestrians like Mr. Lyle Dotson" is too speculative to create a genuine dispute with regard to causation.

unconstitutional policy. Furthermore, the evidence described above does not, without more, lead to the conclusion that Defendant Edmonson was plainly incompetent, in knowing violation of the law, or objectively unreasonable.[160] Accordingly, Defendant Edmonson is entitled to qualified immunity on this claim.

3.    *Failure to Adopt Policy*

Defendant moves for summary judgment that Defendant Edmonson is entitled to qualified immunity on Plaintiff's claim of failure to adopt necessary policies.

A supervisory official may be held liable for failing to adopt a policy if that failure amounted to deliberate indifference.[161] In this context, deliberate indifference requires "that a municipal actor disregarded a known or obvious consequence of his action."[162] "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference, because without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[163] The Court must consider whether Defendant Edmonson's actions were objectively reasonable in light of the clearly established law regarding investigative stops and unlawful arrests. He is only liable for the failure to promulgate policy if he acted with deliberate indifference to the constitutional rights asserted by the Plaintiff.[164]

---

[160] *See Brown v. Callahan*, 623 F.3d 249, 257 (5th Cir. 2010) (finding evidence that is insufficient to show deliberate indifference was also insufficient to deprive official of qualified immunity).
[161] *Porter*, 659 F.3d at 446 ("Liability for failure to promulgate policy and failure to train or supervise both require that the defendant have acted with deliberate indifference.")
[162] *Id.* (citing *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (1997)).
[163] *Id.*
[164] *See Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) ("[W]e must consider whether Epps's actions were objectively reasonable in light of the clearly established law that a prison official must ensure an inmate's timely release from prison and that such an official may be liable for failure to promulgate policy . . . if he acted with deliberate indifference to constitutional rights.")

Plaintiff argues that the failure to adopt policies on pedestrian stops, community policing, and cross-racial identification creates § 1983 supervisory liability for Defendant Edmonson because the failure led to the violation of his constitutional rights.[165] Plaintiff submits evidence establishing: (1) LSP does not have a policy on conducting foot patrols;[166] (2) LSP does not have a policy on community policing;[167] (3) LSP does not have a policy on cross-racial identification;[168] (4) LSP does not have a policy on patrol in New Orleans.[169] Plaintiff also presents a report by his expert witness, Dr. Robert Taylor, in which he analyzes the policies of the LSP in comparison to those of the NOPD, and discusses the competencies of the LSP troopers and Defendant Edmonson.[170] Based on his review of the LSP policy manual and the Defendants' deposition testimony in which they describe their understanding of reasonable suspicion and probable cause, Dr. Taylor concludes that the Defendant Troopers have been inadequately trained on reasonable suspicion, probable cause, and community policing.[171]

The Court finds the Plaintiff failed to provide evidence sufficient to create a genuine dispute with respect to whether Edmonson met the "stringent standard of fault" of deliberate indifference.[172] To establish that a state actor disregarded a known or obvious consequence of his actions, there must be "actual or constructive notice" "that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights" and the actor nevertheless "chooses to retain that program."[173]

---

[165] *See* R. Doc. 97 at 25; R. Doc. 112.
[166] R. Doc. 97-15 at 168 (Deposition of Michael Edmonson).
[167] R. Doc. 97-10 at 56 (Deposition of Huey McCartney).
[168] R. Doc. 97-12 at 186 (Deposition of Rene Bodet).
[169] R. Doc. 97-10 at 60 (Deposition of Huey McCartney).
[170] R. Doc. 88.
[171] *Id.*
[172] *Id.* (citing *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (1997)).
[173] *Id.*

Plaintiff has put forward only three instances of alleged constitutional violations. For the reasons explained above, these incidents, without more, do not amount to a pattern that would put Defendant Edmonson on actual or constructive notice that the gaps in the LSP training program would have the "obvious consequence" of producing the constitutional violations alleged by the Plaintiff.[174]

The Court agrees that the conclusions in Dr. Taylor's report are troubling, and that the Troopers' failure to articulate standards for reasonable suspicion and probable cause suggests a training program in need of scrutiny and possible reform. Nevertheless, the evidence, as a whole, is insufficient to create a genuine dispute of fact as to whether Defendant Edmonson's failure to adopt policies on foot patrols, community policing, and cross-racial identification was contrary to law or objectively unreasonable.

Accordingly, Defendant Edmonson is entitled to qualified immunity on Plaintiff's § 1983 claim for supervisory liability under a theory of failure to promulgate a policy.

## CONCLUSION

**IT IS ORDERED** that the Defendants' motion for summary judgment with respect to Plaintiff's 42 U.S.C. § 1983 claim against Defendants McCartney, Anderson, and Journee for use of excessive force is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that the Defendants' motion for summary judgment with respect to Plaintiff's 42 U.S.C. § 1983 claims against Defendants Bodet, McCartney, Anderson, and Journee for unlawful stop and unlawful arrest is hereby **DENIED**.

---

[174] *Id.* at 447.

**IT IS FURTHER ORDERED** that the Defendants' motion for summary judgment with respect to Plaintiff's state law claims against Defendants Bodet, McCartney, Anderson, and Journee is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Defendants' motion for summary judgment with respect to Plaintiff's 42 U.S.C. § 1983 claims against Defendant Edmonson is hereby **GRANTED**. Defendant Edmonson is entitled to judgment as a matter of law with respect to Plaintiff's claim pursuant to 42 U.S.C. § 1983.[175]

**New Orleans, Louisiana, this 22nd day of January, 2018.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[175] There are no remaining state law claims against Defendant Edmonson. *See* R. Doc. 112-1 and R. Doc. 129. On January 16, 2018, Plaintiff filed a motion to supplement the summary judgment record. R. Doc. 143. The attachments to that motion do not further Plaintiff's claim that a pattern exists. Therefore, the attachments are not material with respect to the Court's grant of Defendant's motion for summary judgment in favor of Defendant Edmonson. The motion to supplement the record is denied as moot.