## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

LYLE DOTSON,                     &ast; NUMBER: 16-cv-15371-SM-JVM
   Plaintiff,        &ast;
                                 &ast;
   v.                 &ast; SECTION: E
                                 &ast;
TROOPER HUEY MCCARTNEY,          &ast; JUDGE:
TROOPER CALVIN ANDERSON,         &ast; SUSIE MORGAN
TROOPER TAGEE JOURNEE, and       &ast;
TROOPER RENE BODET, each in their &ast; MAGISTRATE:
individual capacities.           &ast; JANIS VAN MEERVELD
   Defendants.       &ast;
_____  &ast;
                                 &ast;

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR NEW TRIAL

### I. Introduction

Plaintiff Lyle Dotson moves this Court for a new trial, pursuant to Fed. R. Civ. P. 59. Plaintiff raises four issues and the scope of the new trial requested differs depending on the grounds asserted.

First, Plaintiff asserts that the Court erred by denying Plaintiff's Batson[1] objection, in particular with respect to the third step of the Batson analysis. "[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the [striking party's] justification for [its] peremptory strike. At this stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."[2] Further, where a striking party's "proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."[3] If

---

[1] Batson v. Kentucky, 476 U.S. 79 (1986).
[2] Fields v. Thaler, 588 F.3d 270, 274 (5th Cir. 2009), quoting Miller-El v. Cockrell (Miller-El I), 537 U.S. 322, 338-339 (2003) (internal quotation marks and citations omitted).
[3] Miller-El v. Dretke (Miller-El II), 545 U.S. 231, 241 (2005).

the Court sustains this ground, Lyle Dotson is entitled to a new trial against all Defendants on all claims.

Second, Plaintiff challenges the jury's verdict in favor of Defendant McCartney on the Unreasonable Arrest claim,[4] on grounds that the answers to jury interrogatories 7(a) and (b) are irreconcilable with the answers to interrogatories 11(a), (b), and (c).[5] If these grounds are sustained, Lyle Dotson is entitled to a new trial against Defendant McCartney on the Unreasonable Seizure or Arrest – Photograph and Unreasonable Arrest claims.

Third, Plaintiff asserts that the jury's verdict in favor of Defendants McCartney, Anderson, and Journee on the Unreasonable Arrest claim is contrary to the great weight of the evidence. A ruling in Plaintiff's favor on this argument requires the grant of a new trial against these three Defendants on this claim.

Finally, Plaintiff challenges the jury's verdict in favor of Defendants Anderson and Journee on the Unreasonable Seizure – Handcuffing claim as being contrary to the great weight of the evidence. If the Court sustains this challenge, Lyle Dotson is entitled to a new trial against Defendants Anderson and Journee on that claim.

## II.  Procedural History

Plaintiff Lyle Dotson, an African American male, brought suit against several Louisiana State Police troopers alleging violations on his constitutional rights during a seizure and arrest in the French Quarter in October 2015. The trial in this case began on January 24, 2018.[6] At voir dire, Plaintiff lodged a Batson challenge to Defendants' strike of Juror No. 8, Marcus Henderson. Juror

---

[4] In this Memorandum, Plaintiff labels his claims in the manner in which they were presented in the Court's Instructions (ECF No. 169) and the Jury Verdict Form (ECF No. 165): Unreasonable Stop, Unreasonable Seizure – Handcuffing, Unreasonable Seizure or Arrest – Photograph, and Unreasonable Arrest.

[5] Fiber Systems Intern., Inc. v. Roehrs, 470 F.3d 1150, 1167-68 (5th Cir. 2006), citing FDIC v. Fid. & Deposit Co., 45 F.3d 969, 977 (5th Cir. 1995).

[6] ECF No. 158.

2

Henderson is an African American male. Defendants' only proffered reason for striking Juror Henderson was their concern for a "scholastic connection" which could lead this juror to favor the Plaintiff. Specifically, Defendants stated that Juror Henderson is pursuing a graduate degree and is currently employed as a teacher, and that these facts would create a "scholastic connection" with a witness in the case, Olon Dotson, a college professor and father of Plaintiff Lyle Dotson.

In articulating his <u>Batson</u> challenge, Plaintiff directed the Court to seated white jurors who Defendants did not strike – particularly Juror No. 7, Heidi McKinley, and Juror No. 11, Sean Murphy – who possessed such "scholastic" characteristics which Defendants posited as their reason for the strike of Juror Henderson. Further, as Defendants only exercised a peremptory challenge as to Juror Henderson where two other peremptory strikes were available, Defendants blocked Juror No. 20, Kevin Arnold, from being seated on the jury. Mr. Arnold is an African American male.

After a four day trial, the jury found Defendant Huey McCartney violated Plaintiff's Fourth Amendment rights by "continuing to detain Plaintiff after any reasonable suspicion for the stop had dissipated."[7] The jury further found that "no reasonable officer would have believed Defendant McCartney's actions were lawful."[8] However, the Jury did not find that Huey McCartney's actions were the cause of damage to Plaintiff Lyle Dotson.[9]

Plaintiff moved for entry of judgment on the Unreasonable Seizure or Arrest – Photograph claim for nominal damages.[10] Defendants did not contest Plaintiff's right to judgment on that claim, but did object to the amount sought by Plaintiff.[11] This Court granted Plaintiff's motion,

---

[7] ECF No. 165 at 5 (Question 7(a)).
[8] <u>Id</u>. (Question 7(b)).
[9] <u>Id</u>. (Question 7(c))
[10] ECF No. 172.
[11] ECF No. 177 at 3 ("Defendants concede that relevant Fifth Circuit case law likely requires the Court to enter judgment for Plaintiff against Trooper McCartney on this single claim and award nominal damages for that claim.").

and ordered that judgment for Plaintiff would be entered against Defendant McCartney on the Unreasonable Seizure or Arrest – Photograph claim with an award of nominal damages in the amount of $1,000.[12] On February 23, 2018, this Court entered judgment consistent with that order.[13]

### III. Grounds for Granting New Trial

Under Fed. R. Civ. P. 59, a district court may grant a new trial if it finds that the verdict is against the weight of the evidence, or if prejudicial error was committed in the course of the trial.[14] Mistaken adjudication of a party's Batson objections is one such error. [15] A new trial may also be granted when the jury's inconsistent verdict cannot be reconciled.[16] The decision whether to grant a new trial is left to the sound discretion of the trial judge, and the court's authority is broad.[17]

### A. The Denial of Plaintiff's Batson Challenge Caused Substantial Prejudice to Plaintiff, Requiring a New Trial on All Issues Against All Defendants.

### 1. Application of Batson to Civil Cases

In Batson v. Kentucky, 106 S. Ct. 1712 (1986), the United States Supreme Court held that the Equal Protection Clause forbids the striking of potential jurors on account of their race, and established a three step analysis by which the courts were to determine whether such a violation occurred. The Fifth Circuit has articulated this analysis:

> First, a defendant must present a prima facie case that the prosecution exercised its peremptory challenges on the basis of race. Second, if the defendant meets this initial burden, the burden shifts to the prosecutor to present a race-neutral explanation for striking the jurors in question. Third, the court must determine whether the

---

[12] ECF No. 178.
[13] ECF No. 179.
[14] Thibodeaux v. Wellmate, No. 12-1375, 2016 WL 4138645 at *1 (E.D. La. Aug. 4, 2016), citing Smith v. Transworld Drilling Co., 773 F.2d 610, 613 (5th Cir. 1985).
[15] United States v. Huey, 76 F.3d 638, 641 (5th Cir. 1996) (quoting Georgia v. McCollum, 505 U.S. 42, 49 (1992), in finding district court "committed reversible error in determining implicitly that the equal protection rights of these jurors had not been violated. Such error requires a new trial as to both Garcia and Huey").
[16] Crossland v. Canteen Corp., 711 F.2d 714, 725-26 (5th Cir. 1983).
[17] Jordan v. Ensco Offshore Co., No. 15-1226, 2016 WL 4010986 at *2 (E.D. La. July 27, 2016).

defendant has carried his burden of proving purposeful discrimination. Implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.[18]

The holding of <u>Batson</u>, which originated from a state criminal trial, has since been extended to civil trials.[19] As had been made clear in <u>Batson</u> itself and other subsequent Supreme Court rulings, it is the constitutional right of the excluded juror himself which is violated when a party uses its peremptory challenge to strike that potential juror on the basis of race. And further, the Supreme Court has recognized the third-party standing of the defendant – in the context of a criminal trial – to raise the excluded juror's equal protection rights.[20] Applying these same principles, the Supreme Court has concluded that "discrimination on the basis of race in selecting a jury in a civil proceeding harms the excluded jurors no less than discrimination in a criminal trial."[21] In <u>Edmonson</u>, the Supreme Court also concluded that the holdings of <u>Batson</u> and its progeny extended to civil litigation between private litigants, not just government officials.

## 2.   Racial Composition of Potential Jurors

"When reviewing a <u>Batson</u> ruling regarding purposeful discrimination, the Supreme Court has initially considered statistical evidence when considering whether the prosecution used its peremptory strikes in a discriminatory manner."[22] This statistical analysis must extend beyond the empaneled jurors to the venire itself. "As common sense would dictate, disproportionate strike

---

[18] <u>Smith v. Cain</u>, 708 F.3d 628, 636 (5th Cir. 2013) (internal citations omitted).
[19] <u>See</u> <u>Edmonson v. Leesville Concrete Co., Inc.</u>, 500 U.S. 614 (1991) (finding a violation of the equal protection component of the Fifth Amendment's Due Process Clause in a federal civil case where peremptory challenges were used to exclude jurors on account of their race).
[20] <u>Edmonson</u>, 500 U.S. at 618.
[21] <u>Id.</u> at 619, <u>citing</u> <u>Thiel v. Southern Pacific Co.</u>, 328 U.S. 217, 220 (1946).
[22] <u>Hayes v. Thaler</u>, 361 Fed.Appx. 563, 570 (5th Cir. 2010) (<u>citing</u> <u>Miller-El v. Cockrell (Miller-El I)</u>, 537 U.S. 322, 342 (2003), and <u>Miller-El v. Dretke (Miller-El II)</u>, 545 U.S. 231, 240-41 (2005).

rates involving the entire venire are also relevant in considering the ultimate question whether a particular strike was discriminatory."[23]

Prior to the start of trial, the Court indicated that eight (8) jurors would be selected; no alternates were to be chosen. Further, the Court provided that each side would have three (3) peremptory challenges to be used, in addition to any dismissals for hardship or challenges for cause.[24] Thirty-five (35) potential jurors were brought into the courtroom for jury selection on January 24, 2018.[25] Of those 35, twenty-three (23) were identified as white, ten (10) were identified as black/African American, and two (2) were identified as other or mixed race. Thus whites comprised 66% of the eligible jurors; African Americans accounted for 29%.

Following the dismissal of some eligible jurors for cause and for hardship, the first fourteen (14) jurors available for selection and/or peremptory challenge were comprised of 11 whites (79%) and 3 African Americans (21%).[26] Defendants then used their peremptory strikes to exclude two of these three (67%) African American venire members who could have been seated on the jury. Defendants used a peremptory challenge to strike Juror No. 8, Marcus Henderson. And Defendants purposefully used only one of three peremptory challenges available to them, thereby also excluding Juror No. 20, Kevin Arnold, from the jury. Mr. Henderson and Mr. Arnold are African American males. As a result, only one African American was seated on the jury, Juror No. 12

---

[23] Chamberlin v. Fisher, No. 15-70012, 2018 WL 1391732 *12 (5th Cir. Mar. 20, 2018) (Costa, J., dissenting) (citing Miller-El v. Cockrell (Miller-El I), 537 U.S. 322, 342 (2003), and Miller-El v. Dretke (Miller-El II), 545 U.S. 231, 265 (2005).

[24] ECF No. 130 at 3.

[25] The parties were provided with the Panel Selection Report by the Court's Case Manager, Brad Newell, on Monday, January 22, 2018, by electronic mail. At that time, two potential jurors (No. 3 and No. 37) had been excused by the Jury Division due to hardships. The Selection Report contained 48 remaining names, but the Case Manager informed the parties that only the first 35 available names would be brought into the courtroom for voir dire. Exhibit A, Email from Brad Newell, January 22, 2018; Exhibit B, Panel Selection Report. Juror No. 18 was a "no show" for voir dire on January 24, 2018.

[26] Given that eight (8) persons were to be seated on the jury, with no selection of alternates and three (3) peremptory challenges available to each party, only the first fourteen (14) jurors would possibly make it onto the jury. From the Panel Selection Report, this included (with race indicated) Juror Nos. 1 (W), 2 (W), 4 (W), 6 (W), 7 (W), 8 (B), 9 (W), 10 (W), 11 (W), 12 (B), 13 (W), 19 (W), 20 (B), and 22 (W).

(Carlos Stampley). The final composition of the jury was 7 whites and 1 African American. "Happenstance is unlikely to produce this disparity."[27]

### 3. Defendants' Peremptory Challenge on Juror Henderson

Following the exercise of peremptory challenges, the Plaintiff initiated a <u>Batson</u> challenge based on the Defendants' use of their sole peremptory strike to exclude Juror Henderson from his service:

> The Court: Counsel, are there any Batson challenges that we need to discuss?
>
> Mr. Craig: Yes, Your Honor. For the plaintiff, we challenge the strike on Mr. Henderson. He is the only peremptory challenge that was issued. He is a black male. Additionally, by electing not to use all of their peremptory challenges, the next juror up, if they had used even one challenge on a white juror, would have been Juror Arnold who is No. 20.[28] And so we think that's the functional equivalence of a peremptory challenge. That would be the grounds for our challenge, Your Honor. And obviously the Court knows, and there is plenty enough in the papers filed by the parties, that this is a 1983 case regarding a young black man challenging his arrest.[29]

The Court then correctly found that Plaintiff had established a prima facie case that Defendants had used its peremptory challenges on the basis of race, the first step in the <u>Batson</u> analysis:

> The Court: Okay. All right. So what - - so the plaintiffs have made a Batson challenge with respect to Marcus Henderson, and I think they made a *prima facie* case. Mr. Henderson is 49 years old. He is from New Orleans. He had been a juror once but it was 20 years ago. He is married. [H]is wife is a principal. He's [a] teacher of English and he's a coach. He is getting a Ph.D. in education administration. He has one son who is ten. He had a younger brother who worked for an attorney but he's not sure what his job is.
>
> So now - - I think the plaintiffs have made a *prima facie* case. There's nothing that I see that would be of any concern in this case

---

[27] <u>Miller-El v. Cockrell (Miller-El I)</u>, 537 U.S. 322, 342 (2003).
[28] Juror Arnold is also a black male. <u>See</u> Ex. B at 11.
[29] Tr. 78-79.

so I think the next step is for the striking party to articulate a race-neutral reason for the strike.[30]

In response, the Defendants offered the following reason for their strike of Mr. Henderson, attempting to fulfill the second step of <u>Batson</u> which requires a race neutral explanation:

> Mr. Gaudin: Yes, You Honor. In fact, Mr. Henderson is an educational - -
>
> ***
>
> Mr. Gaudin: He's an educational administration graduate from the University of Kentucky. As he told us, he's a teacher of English. In fact, this case involved a professor who brought his students down to New Orleans for an architectural tour. My clients were concerned that the scholastic connection would tend to make Mr. Henderson favor the plaintiff in this case over the defense. It's that simple.[31]

The Plaintiff responded:

> Mr. Craig: Yes, Your Honor. First of all, with respect to the concern, the witness - - of course, it's not referring to Lyle Dotson, it's referring to Olon Dotson, and so we think that's exceptionally peripheral to this case as it played out. The Court granted summary judgment as to Olon Dotson.
>
> There are also other people certainly in education. Perhaps not college education, but Mr. Murphy has been a teacher for years. Ms. McKinley is starting to tutor as a teacher - - as a person at Delgado Community College. And we think that this is a matter of concern. Mr. Henderson appears well qualified, and we would ask the Court to set aside the challenge.[32]

The Court then reached the following conclusion:

> The Court: The cases say that when looking at whether a race-neutral reason has been articulated, the explanation has to be clear and reasonably specific. Unless its discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. And that's *Hernandez v. New York*, 476 U.S. 352.
>
> And I think that the defendants have articulated a reasonable reason for excluding this juror, so the Batson challenge is denied.[33]

---

[30] Tr. 80.
[31] Tr. 81.
[32] Tr. 81-82.
[33] Tr. 82.

While the Court cited to Hernandez v. New York[34] for the proposition that the reason offered for a strike will be deemed race-neutral unless a discriminatory intent is inherent in the explanation, this rationale only concerns **the second step** of the Batson analysis. As Hernandez explains, "[a]t this step of the inquiry, the issue is the facial validity of the prosecutor's explanation."[35] But in **the third step** of the analysis set out by Batson and its progeny, a court is to assess all relevant circumstances to determine whether the party challenging the strike carried its burden of establishing purposeful discrimination by the striking party.[36]

In Plaintiff's view, this Court did not engage in the third step of the Batson analysis. The comparative juror analysis offered by Plaintiff regarding the strike of Juror Henderson, not to mention the Defendants' use of their peremptory challenges to exclude all but one African American from the seated jury, is evidence of Defendants' purposeful discrimination. Plaintiff contests this Court's denial of his Batson challenge.

### 4.   The Comparative Juror Analysis and Assessment of Purposeful Discrimination

The third step of Batson is at issue in this case. "When the process reaches this step, the [party challenging the strike] may rely on all relevant circumstances to raise an inference of purposeful discrimination."[37] As recognized by the Supreme Court and by the Fifth Circuit, "the critical question in determining whether [the plaintiff] has proved purposeful discrimination at step three is the persuasiveness of [the defendants'] justification for [their] peremptory strike. At this stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for

---

[34] 500 U.S. 352, 360 (1995).
[35] Id.
[36] Id. at 363.
[37] Fields v. Thaler, 588 F.3d 270, 274 (5th Cir. 2009), quoting Miller-El II, 545 U.S. at 240; see also Hernandez, 500 U.S. at 363 (an "invidious discriminatory purpose may often be inferred from the totality of the relevant facts"); Rhoades v. Davis, 852 F.3d 422, 434 (5th Cir. 2017) (finding "At the third step, the [party challenging the strike] may rely on all relevant circumstances to show purposeful discrimination.").

purposeful discrimination."[38] At Batson's third step, the court is tasked with addressing "whether counsel is telling the truth in his or her assertion that the challenge is not race-based," considering "the totality of the relevant facts."[39]

In Miller-El v. Dretke (Miller-El II),[40] the Supreme Court held that, if "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Finding "side-be-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" to be "more powerful than . . . bare statistics,"[41] the Supreme Court employed a "comparative juror analysis" in finding the state court had erred when it found the prosecution's race-neutral explanations of its strikes to be non-pretextual. Since the Supreme Court's ruling, the Fifth Circuit has relied on the ruling in Miller-El II and has employed a comparative juror analysis[42] upon review of a Batson challenge.[43]

---

[38] Fields, 588 F.3d at 274, quoting Miller-El v. Cockrell (Miller-El I), 537 U.S. 322, 338-339 (2003).

[39] Hernandez v. New York, 500 U.S. 352, 363 (1991) (quoting Washington v. Davis, 426 U.S. 229, 242 (1976)); Rhoades v. Davis, 852 F.3d 422, 434 (5th Cir. 2017).

[40] 545 U.S. 231, 241 (2005).

[41] Id.

[42] See Reed v. Quarterman, 555 F.3d 364, 372-375 (holding "[w]e recently agreed that Miller-El requires us to consider a "comparative juror analysis" in a Batson claim," citing United States v. Brown, 553 F.3d 768 (5th Cir. 2008)). See e.g. Smith v. Cain, 708 F.3d 628, 636 (5th Cir. 2013) ("In conducting the required comparative analysis, we are guided by the Supreme Court's decision in Miller-El."); Fields v. Thaler, 588 F.3d 270 (5th Cir. 2009). "In Miller-El v. Dretke . . . the Supreme Court made clear that the evidence to be considered by the court includes, among other things, a "comparative juror analysis."" Brown, 553 F.3d at 796.

[43] Recently the en banc Fifth Circuit decided Chamberlin v. Fisher, No. 15-70012, 2018 WL 1391732 (5th Cir. Mar. 20, 2018), reversing habeas relief in a state criminal case. Chamberlin is readily distinguishable from this case. First, Chamberlin's claim was governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which restricts a federal court's ability to grant habeas relief after an adjudication on the merits in state court to the following two grounds: misapplication of clearly established federal law and/or unreasonable determination of the facts. This burdensome framework does not apply to Plaintiff's §1983 civil lawsuit. Also the factual history of Plaintiff Dotson's Batson challenge differs from the challenge in Chamberlin in fundamental ways: (1) Chamberlin did not seek a comparative juror analysis at trial or on direct appeal; but as discussed herein, Dotson explicitly raised a comparative juror analysis; (2) unlike Chamberlin, where a comparative juror analysis was ultimately conducted by a court on state post-conviction, and no evidence of disparate treatment was found, no comparative juror analysis was ultimately conducted by the Court at the Dotson trial and no decision has been made on its merits; (3) unlike Chamberlin, the Defendants in the Dotson trial were afforded an opportunity – due to the specific challenge timely articulated by Plaintiff Dotson during voir dire – but did not attempt to differentiate these two otherwise-similar white jurors; and (4) unlike Chamberlin, the Dotson voir dire revealed no "crucial differences" between the struck black juror and the otherwise-similar white jurors who were seated.

At trial, the Defendants stated that they had exercised their peremptory challenge on Juror Henderson because the juror's "scholastic connection" would tend to make the juror favor the Plaintiff. As stated on the trial record, this articulated "scholastic connection" consisted of the facts that (1) Mr. Henderson is seeking a graduate degree in educational administration from the University of Kentucky; (2) Mr. Henderson is currently a teacher of English; and (3) a witness in the case – the Plaintiff's father, Olon Dotson – is a professor who brought his students to New Orleans for an architectural tour.[44] This was the only reason Defendants articulated for their strike of Juror Henderson.[45]

As he did in voir dire, Plaintiff contends this reason is pre-textual. Even on its face, Plaintiff argued that this reason was suspect, as Olon Dotson would appear merely as a witness in the case, the Court having previously granted summary judgment as to any claims regarding Professor Dotson on Defendants' motion. And further, Plaintiff specifically directed the Court to two white jurors – Juror McKinley and Juror Murphy – who could also be described as having a "scholastic connection" based on their involvement in education.[46] In response to the Court's voir dire, Juror McKinley offered the following information regarding her academic studies and her employment:

---

[44] Tr. 81. It is also worth noting that all potential jurors had already been ask by the Court in voir dire as to whether they had any actual knowledge of the Plaintiff, Lyle Dotson, or the Plaintiff's father, Olon Dotson. No juror responded to this question in the affirmative. Tr. 7-8.

[45] In review of Batson challenges originating from criminal trials, the Fifth Circuit has previously held that a Batson claim may fail on a third step "comparative juror analysis" where the striking party provided a second, legitimate reason for striking a black juror. See e.g. Fields v. Thaler, 588 F.3d 270, 277 (5th Cir. 2009) ("Although defense counsel argues on direct appeal that three white jurors with relatives who had criminal involvement served on the jury, the defense offered nothing – either at trial or on direct appeal – to rebut the second reasons for the prosecutor's strikes or to show that those reasons were pretextual."); United States v. Brown, 553 F.3d 768 (5th Cir. 2008) (holding that Batson claim failed because the prosecution had provided a second, legitimate reason for striking the black juror). But here, Defendants' proffered only one reason for striking Juror Henderson – a purported "scholastic connection" based on his enrollment in a graduate program and his employment as a teacher. Plaintiff explicitly rebutted this reason by citing to the "scholastic connection" which Jurors McKinley and Murphy would also share under Defendants' rationale. Plaintiff's claim cannot fail as Defendants did not provide any other legitimate reason for the strike of Juror Henderson.

[46] Tr. 81. Plaintiff did not waive a Batson claim based upon comparative juror analysis in this case; rather, during voir dire, he rebutted the Defendants' reason for striking Juror Henderson and directed the Court specifically to other similar white jurors who were not struck.

The Juror: I'm Heidi McKinley, No. 7. I'm 35 years old. I've lived in New Orleans two and a half years no. I'm single. **I have some of a master's degree finished.** I work in the service industry at a wine bar, **and I'm hopefully tutoring at Delgado.** No children.

The Court: What are you getting your master's degree in?

The Juror: Creative writing.

The Court: You said you've been in New Orleans?

The Juror: Two and a half years.

The Court: Where were you before then?

The Juror: Iowa.[47]

Juror McKinley had also previously offered the following information when the Court inquired as to whether the trial schedule would give anyone a serious problem:

The Juror: Hi. Heidi McKinley, Juror 7. I just got hired at a new job, and they were going to start next week. It's probably - - I don't know if they would not hire me because of this, I haven't really talked to them. But I also work two jobs. And I'm, like, in my thesis stage of graduate school, so a week off would probably set me back in some rent and work time, but otherwise not the end of the world.

The Court: Who is your new job with?

The Juror: Delgado Community College.

The Court: And then you're working two jobs right now?

The Juror: Well, the Delgado would be the new second job.

The Court: And then you are working on your thesis?

The Juror: Yes.[48]

And Juror Murphy provided the following information regarding his employment:

The Juror: Sean Murphy, Juror No. 1. I'm 38 years old. I've lived in Orleans Parish for the last five years. Before that time I was in Jefferson Parish. **I**

---

[47] Tr. 38 (emphasis added).
[48] Tr. 34 (emphasis added).

**have a bachelor's degree from UNO. I work at St. Mary Magdalene.**

The Court: What is your bachelor's degree in?

The Juror: History.

**I work at St. Mary Magdalene school in Metairie as a technical coordinator and computer teacher. I've been there about four years. Before that time I was at Resurrection of Our Lord school in New Orleans East.** I have no children.[49]

In this Motion for New Trial, Plaintiff claims that the Court erred by failing to apply the comparative juror analysis at step three of the Batson analysis where the Plaintiff proffered specific examples of other white jurors who were seated by the Defendants who possessed the same characteristics the Defendants relied upon in their strike of Juror Henderson. Plaintiff contends that the race-neutral reason offered by Defendants in their challenge of Mr. Henderson – namely his "scholastic connection" – is merely a pretext for a purposefully discriminatory strike.[50] The Fifth Circuit has clearly set out "the required comparative analysis," as guided by Miller-El II:

> If the [striking party] asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination. In addition, if the [striking party] asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the [striking party's] failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination. Lastly, we must consider only the [striking party's] asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors.[51]

Here, Defendants did not exercise a peremptory challenge as to either Juror McKinley or Juror Murphy, despite the fact that both of these jurors informed the Court and the parties of

---

[49] Tr. 40-41 (emphasis added).

[50] "It is Batson's third step that is the focus of this appeal . . . . We ask whether the state's proffered, race-neutral explanations are a pretext for purposeful discrimination based on a comparative analysis of prospective jurors." Smith v. Cain, 708 F.3d 628, 636 (5th Cir. 2013).

[51] Smith v. Cain, 708 F.3d at 636 (citing Reed, 555 F.3d at 376) (internal citations omitted).

enrollment in a graduate degree program and employment in education – the facts cited by Defendants as the "scholastic connection" in their explanation provided for striking Juror Henderson. Defendants' proffered reason for striking Juror Henderson applied just as well to two otherwise-similar white jurors who were permitted to serve. "[T]hat is evidence tending to prove purposeful discrimination to be considered at <u>Batson's</u> third step."[52]

Further, Defendants' failed to question Juror Henderson – or any juror – as to whether their "connection" with education would bias them in favor of the Plaintiff. The Court provided both parties with an opportunity to pose follow up questions as to any particular jurors as well as to any relevant topic which had not previously been covered in the Court's voir dire.[53] Yet Defendants did not ask that specific jurors who expressed involvement in teaching, schooling, or academics be questioned as to any potential bias. Further, Defendants had not submitted any questions to the Court in advance of trial asking for this topic to be included in the Court's voir dire of potential jurors.[54]

Lastly, step three of the <u>Batson</u> analysis looks at the totality of the circumstances in assessing whether the striking party purposefully discriminated in its use of peremptory challenges; it is at this step "that the persuasiveness of the justification becomes relevant,"[55] and the court addresses "whether counsel is telling the truth in his or her assertion that the challenge is not race-based."[56] As such, Plaintiff argues that this Court should also assess (1) Defendants' failure to seek voir dire of the potential jurors as to any possible bias due to their involvement in education or academic studies, and (2) Defendants' intentional use of only one of its peremptory

---

[52] <u>Miller-El II</u>, 545 U.S. at 241.
[53] Tr. 68-70.
[54] The Court's Scheduling Order, ECF No. 118 at 3 and Pre-Trial Notice, ECF No. 11-1 at 8, provided for parties to submit proposed Voir Dire questions in advance of trial on January 12, 2018.  Plaintiff submitted proposed Voir Dire questions. ECF No. 135. Defendants did not.
[55] <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995) (<u>citing</u> <u>Batson</u> and <u>Hernandez</u>).
[56] <u>U.S. v. Bentley-Smith</u>, 2 F.3d 1368, 1375 (5th Cir. 1993).

14

challenges so as to exclude Juror Arnold from inclusion on the jury, along with (3) Defendants' lack of challenge or strike of two similarly situated white jurors as detailed above.

When these three factors are taken together, Defendants' facially race-neutral reason for striking potential Juror Henderson falls away, leaving only Mr. Henderson's race to explain Defendants' use of their single peremptory challenge. Even one erroneously-denied <u>Batson</u> challenge is grounds for a new trial.[57] Because this legal error prejudiced Plaintiff's rights under the Fourteenth Amendment to race-neutral jury selection, the verdict should be vacated and a new trial ordered on all issues as to all Defendants.

**B. <u>The Jury's Inconsistent Answers to Questions 7 and 11 Require a New Trial Against Defendant McCartney on the Unreasonable Seizure or Arrest and Unreasonable Arrest Claims.</u>**

Defendant Huey McCartney arrested Lyle Dotson for battery on an officer based on events that occurred while McCartney physically detained Dotson while attempting to take his photograph.[58] The jury found that Defendant McCartney's continued detention of Lyle Dotson to take his photograph was an unreasonable seizure in violation of the Fourth Amendment;[59] but, although the jury was instructed that Lyle had a right to resist an unlawful seizure,[60] they also found that Defendant McCartney's arrest of Lyle Dotson for battery on an officer did not violate Lyle Dotson's rights.[61] These two findings are irreconcilably inconsistent and require that the Court grant a new trial on Lyle Dotson's claims against Huey McCartney.

---

[57] <u>Snyder v. Louisiana</u>, 552 U.S. 472, 478 (2008) ("the Constitution forbids striking even a single prospective juror for a discriminatory purpose") (citations omitted).
[58] Trial Ex. 4 (McCartney Arrest Report) at 3 ("Dotson kicked TFC McCartney two times on his right hand in an attempt to avoid having his picture taken"); Tr. 388:7 – 390:25 (Journee); 419:6 – 423:15 (Anderson); 460:9 – 461:22 (McCartney).
[59] ECF No. 165 at ¶¶ 7(a), (b) and (c).
[60] ECF No. 169 at 7 ¶ 39.
[61] ECF No. 165 at ¶¶ 11(a), (b), and (c).

"[T]he jury's verdict is required to reflect a consistent view of the facts."[62] Thus, if the jury's answers to special interrogatories are in irreconcilable conflict, then the court has no authority to enter judgment based on those answers.[63] For this reason, a party is not precluded from raising the inconsistency of the jury's interrogatory answers for the first time in a motion for new trial.[64]

In determining whether answers are inconsistent, the court looks to "whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted."[65] Thus, if a jury returns a verdict that contains apparently inconsistent findings of fact, the court must attempt to reconcile the findings in light of the surrounding circumstances, including the court's instructions.[66]

The jury's answers to Special Verdict Questions 7 and 11 are at issue here:

### UNREASONABLE SEIZURE OR ARREST – PHOTOGRAPH

7.   Does the jury find that Plaintiff Lyle Dotson has established, by a preponderance of the evidence, that:

   a.   Defendant McCartney violated Plaintiff s rights under the Fourth Amendment by continuing to detain Plaintiff after any reasonable suspicion for the stop had dissipated?

   AGREE: ___X___          DISAGREE: _____

   b.   No reasonable officer could have believed that Defendant McCartney's actions were lawful?

   AGREE: ___X___          DISAGREE: _____

---

[62] Crossland Corp., 711 F.2d at 725.
[63] Brunet v. Clear Keys Towing, Inc., No. 95-3013, 1997 WL 240750 at *1 (E.D. La. May 8, 1997), citing Brunner v. Maritime Overseas Corp., 779 F.2d 296, 297 (5th Cir. 1986).
[64] Id.
[65] Fiber Systems Intern., Inc. v. Roehrs, 470 F.3d 1150, 1167-68 (5th Cir. 2006), citing FDIC v. Fid. & Deposit Co., 45 F.3d 969, 977 (5th Cir. 1995).
[66] Riddle v. Tex-Fin, Inc., 719 Supp. 742, 746 (S.D. Tex. 2010), citing Carr v. Wal-Mart Stores, Inc., 312 F.3d 667, 670 (5th Cir. 2002), and United States v. $9,041,598.68, 163 F.3d 238, 249 (5th Cir. 1998).

c.  Defendant McCartney's acts were the cause of Plaintiff Lyle Dotson's damage?

AGREE: _____          DISAGREE: ___X___ [67]

## UNREASONABLE ARREST

11.  Does the jury find that Plaintiff Lyle Dotson has established, by a preponderance of the evidence, that:

a.  Defendant McCartney violated Plaintiff's rights under the Fourth Amendment by falsely arresting Plaintiff for battery against an officer?

AGREE: _____          DISAGREE: ___X___

b.  No reasonable officer could have believed that Defendant McCartney's actions were lawful?

AGREE: _____          DISAGREE: ___X___

c.  Defendant McCartney's acts were the cause of Plaintiff Lyle Dotson's damage?

AGREE: _____          DISAGREE: ___X___ [68]

By responding "AGREE" to Special Verdict Questions 7(a) and (b), the jury found by a preponderance of the evidence that Defendant McCartney violated Plaintiff's rights under the Fourth Amendment by continuing to detain Plaintiff after any reasonable suspicion for the stop had dissipated, and that no reasonable officer could have believed that Defendant McCartney's actions were lawful. But by responding "DISAGREE" to Special Verdict Questions 11(a), (b), and (c), the jury found that Defendant McCartney did not violate Plaintiff's rights under the Fourth Amendment by subsequently arresting Plaintiff falsely for battery against an officer.

---

[67] ECF No. 165 at ¶¶ 7(a), (b) and (c).
[68] ECF No. 165 at ¶¶ 11(a), (b), and (c).

These two sets of answers are in irreconcilable conflict under the instructions of law given

to the jury. Two propositions of law frame the analysis of Special Verdict Questions 7 and 11.

First, the Court instructed the jury that Lyle Dotson had the right to resist an unlawful seizure:

> 39. If the stop, detention, or seizure is unreasonable under the Fourth
> Amendment, then under Louisiana law, an individual has a right to resist that
> stop, detention, or seizure.[69]

Second, the Court instructed the jury that Battery on a Police Officer, the charge for which

Lyle was arrested, required an intentional, unjustified use of force or violence:

> 49. To help you determine whether the Defendants McCartney, Anderson,
> and Journee had  probable cause to arrest Plaintiff Lyle Dotson, I will now
> instruct you on the elements  of the Louisiana state law crime for which
> Plaintiff Lyle Dotson was arrested, battery on a police officer, La. R.S.
> 14:34.2.

> 50. Battery defined in La. R.S. 14:33 requires the (1) intentional, (2)
> unjustified, (3) use of  force or violence, (4) on another person. A battery on
> a police officer requires (1) a  battery, as defined above, without consent
> (2) "when the offender has reasonable  grounds to believe the victim is a
> police officer acting in the performance of his duty."[70]

Defendants did not object to inclusion of this definition of Battery on an Officer in the jury

instructions, and for good reason. A civilian has the right to use "such force as is necessary" to

resist his unlawful arrest.[71] Similarly, Louisiana law creates a right to resist an unlawful

detention.[72]

---

[69] ECF No. 169 at 7 ¶ 39.

[70] ECF No. 169 at 8 ¶¶ 49-50.

[71] City of Monroe v. Goldston, No. 95-0315 (La. 9/29/95), 661 So. 2d 428, 430 (arrestee "struggled with several officers and an attacking police dog, and his response in lashing out at [the officer] and fortuitously hitting him with the ring he was wearing did not exceed the scope of that necessary force"), citing City of New Orleans v. Lyons, 342 So. 2d 196 (La. 1977). See also Harger v. City of West Monroe, No. 14-976, 2015 WL 5518979 at *13 (W.D. La. Sept. 17, 2015) ("It is a long-established principle in Louisiana law that a citizen has the right to resist an unlawful arrest.").

[72] La. R.S. 14:108; State v. Manuel, 2006-0486 (La. App. 4 Cir. 11/21/06), 946 So.2d 245, writ denied, 2006-2981 (La. 9/14/07), 963 So.2d 994.

Thus, the jury's answer to Question No. 11(a) is in irreconcilable conflict with their answers to Questions 7(a) and (b), given that (1) the jury found Defendant McCartney had unreasonably and unconstitutionally seized Lyle Dotson by continuing to detain him for the purpose of taking his photograph; (2) Lyle Dotson had the right to resist this unlawful seizure; and (3) the offense of Battery on an Officer requires that the use of force be unjustified.

Similarly, the jury's answer to Question No. 11(b) is in irreconcilable conflict with their answers to Questions 7(a) and (b). No reasonable officer in Defendant McCartney's position could have believed it was lawful to arrest Lyle Dotson for battery on an officer: in this regard, the Court instructed the jury that law enforcement officers are presumed to know the clearly established law, including that "[o]nce reasonable suspicion no longer exists, law enforcement officers cannot lawfully restrict the movement of the stopped individual for any period of time or for any purpose" and that "[l]aw enforcement officers must have probable cause to make an arrest."[73]

"A finding by the court that the jury's verdict was critically inconsistent requires a new trial since the court cannot separate which inconsistent finding the jury intended to be controlling."[74] Thus, the jury's inconsistent verdict can only be remedied by the grant of a new trial on Lyle Dotson's claims of Unreasonable Seizure or Arrest – Photograph and Unreasonable Arrest against Defendant Huey McCartney.

---

[73] ECF No. 169 at 10 ¶¶ 55, 60 and 61.
[74] Brunet, supra, 1997 WL 240750 at *2, citing Miller v. Royal Netherlands Steamship Co., 508 F.2d 1103, 1106 (5th Cir. 1975).

**C. The Jury's Verdict on Plaintiff's Claims of Unreasonable Seizure – Handcuffing and Unreasonable Arrest Are Contrary to the Great Weight of the Evidence.**

To protect the right of litigants under the Seventh Amendment, the Fifth Circuit requires "that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great - not merely the greater - weight of the evidence."[75] However, this standard is lower than that for a directed verdict or a judgment as a matter of law.[76] Thus, a verdict can be against the "great weight of the evidence," and thus justify a new trial, even if there is substantial evidence to support it.[77] And importantly, in deciding a motion for new trial, the district court "need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence."[78]

**1. Unreasonable Seizure – Handcuffing (Defendants Anderson and Journee)**

First, the jury's verdict that Defendants Anderson and Journee did not violate Plaintiff's rights under the Fourth Amendment for handcuffing and seizing Plaintiff without probable cause[79] is against the great weight of the evidence. On this claim, the Court instructed the jury:

> 36. Handcuffing an individual does not automatically convert an investigatory stop into a seizure or arrest requiring probable cause. The Fourth Amendment requires some reasonable belief that the individual is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the totality of the circumstances. To determine whether the use of handcuffs converts the stop into a seizure requiring probable cause, the relevant inquiry is whether the police were unreasonable in failing to use less intrusive procedures to safely conduct their investigation, evaluated on the totality of the circumstances.

> 37. When a law enforcement officer handcuffs an individual during an investigative stop when less intrusive measures would have allowed the officer to safely conduct his he stop has become a seizure and must be justified by probable cause, the stop has become a seizure and must be

---

[75] Shows v. Jamison Bedding, Inc., 761 F.2d 927, 930 (5th Cir. 1982).
[76] Id.
[77] Id.
[78] Id.
[79] ECF No. 165 at 4 ¶¶ 5-6.

justified by probable cause.

> 38. A law enforcement officer has probable cause to seize or arrest a person when he has a reasonable belief that a crime has been committed and that the person arrested has committed or participated in the crime. Probable cause is a higher standard than reasonable suspicion, but a lower standard than proof beyond a reasonable doubt. Probable cause must be based on a fair probability that an actual criminal action took place.[80]

The great weight of the evidence proves that Defendants Journee and Anderson handcuffed Plaintiff Dotson within seconds of their initial encounter with him. Because there is no suggestion that these troopers had probable cause to believe that Lyle Dotson had committed or participated in a crime,[81] and there was no indication nor information that Dotson was armed or dangerous, that handcuffing was an unreasonable seizure of Lyle Dotson in violation of the Fourth Amendment.

Defendant Anderson testified that he saw Trooper Bodet at the corner of Bourbon and Toulouse, and that Bodet instructed him to stop a man who turned out to be Lyle Dotson; according to Bodet, Dotson was following an undercover officer.[82] Defendant McCartney concurred in that chronology.[83] According to Defendant McCartney, "we wanted to conduct an investigatory stop, which would include identifying him and finding out – you know, see if he could explain what they perceived to be him following undercovers to determine if he was a threat."[84]

Defendant McCartney testified that Defendants Anderson and Journee were a little bit ahead of him, maybe 10 to 15 feet or so, when they made initial contact with Lyle Dotson on Toulouse Street.[85] Defendant Journee agreed that he and Defendant Anderson reached Lyle Dotson

---

[80] ECF No. 169 at 6-7 ¶¶ 36-38. See United States v. Jordan, 232 F.3d 447, 450 (5th Cir. 2000), citing United States v. Sanders, 994 F.2d 200, 206 (5th Cir. 1993); Bennett v. City of Eastpointe, 410 F.3d 810, 836 (6th Cir. 2005).
[81] Tr. 438:8-15 (McCartney: "we did not have probable cause" at the time of the stop).
[82] Tr. 407:7-408:13.
[83] Tr. 437: 436:5-437:5.
[84] Tr. 438:4-7.
[85] Tr. 438:18-25.

within minutes of each other, and both physically grabbed Dotson to stop him.[86] Defendant Journee

testified that soon after stopping Lyle Dotson, he and Defendant Anderson handcuffed Lyle.[87]

Defendant McCartney testified that Lyle was handcuffed by Anderson and Journee within a minute

– in fact, 10-15 seconds after the initial contact:

> Q.   From the time Troopers Journee and Anderson put their hands on Lyle
> to stop him to the time that he was in handcuffs.
>
> A.   It was less than a minute.
>
> Q.   Would you say it was a short amount of time?
>
> A,   It was a short amount of time.
>
> Q.   Do you recall if there's any conversation that occurred before Lyle
> Dotson was placed in handcuffs?
>
> A.   What I remember is when they first approached and said whatever they
> said, and he turned around and said, "Whoa," I knew he – whoever had
> grabbed him. I know he kind of pulled away and twisted his upper body, and
> so pretty much right after that, he was in handcuffs. **I'm thinking 10 or 15
> seconds.**[88]

Journee testified that he had no reason to believe that Dotson was armed or posed a threat

to their safety.[89] Lyle was being cooperative at the beginning of the stop and was not trying to flee,

according to Journee.[90]

Likewise, Trooper Anderson knew nothing about the person to be stopped except that he

was supposedly following an undercover officer in the French Quarter.[91] Specifically, Defendant

Anderson had no information that the person was armed.[92] Moreover, according to Defendant

---

[86] Tr. 550:11-16.
[87] Tr. 381:19-21.
[88] Tr. 441:16-442:2.
[89] Tr. 381:22-24.
[90] Tr. 383:3-7.
[91] Tr. 411:6-19.
[92] Tr. 411:20-25.

Anderson, once Lyle saw that the two men who stopped him were wearing police uniforms, he did

not resist the stop.[93] Despite this, Lyle Dotson was handcuffed:

> Q.  So was there any event or any reason that he – based on his interaction
> with you that required that he be handcuffed? Based on his interaction with
> you.
>
> A:  Based on the information we received, yes, he's going to be handcuffed.
>
> Q.  I'm asking about based on the interaction that you had with Lyle. Was
> there any reason that he gave you to handcuff him?
>
> A.  Well, he was going to be under an investigation. We was conducting an
> investigation. So if he's following UCs around and we stop him, we're going
> to detain him and we're going to handcuff him until we complete the
> investigation.[94]

So, although Anderson had observed nothing, and had been given no information, that the

person he had stopped posed any kind of threat, he handcuffed 18-year old Lyle Dotson because

"I didn't know him from nobody. He could be –he could have a gun on him. He could be a serial

killer. I don't know him. I'm stopping him because I have other undercover troopers telling me

he's following undercover people around while they're doing deals, and that's my specific reason

for stopping him."[95]

This is completely consistent with the practice about which Defendant Anderson testified

in his deposition, and after considerable equivocation, confirmed in his trial testimony, that he

handcuffs persons detained in pedestrian stops 99 percent of the time.[96] Similarly, Defendant

Journee testified that he assumes everyone is armed if they're going to be standing next to him.[97]

These assumptions are directly contrary to the clearly established law that "[t]he Fourth

---

[93] Tr. 413:13-16.
[94] Tr. 414:9-20.
[95] Tr. 415:4-9.
[96] Tr. 404:8-405:24.
[97] Tr. 383:19-384:6.

Amendment requires some reasonable belief that the individual is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the totality of the circumstances."[98]

The overwhelming weight of the evidence at trial was that Defendants Anderson and Journee, with no information other than that a person was reportedly following undercover troopers after a drug buy, handcuffed Lyle Dotson within 15 seconds of their initial contact with him. Lyle remained in handcuffs for the entire encounter, long after it was clear that he was unarmed and posed no threat to the Defendants. There was no justification for the immediate and continued handcuffing of Lyle Dotson – that restraint violated Lyle's Fourth Amendment right to be free from unreasonable seizure.[99]

The jury's verdict that Defendants Anderson and Journee did not violate Lyle Dotson's Fourth Amendment rights by handcuffing him, with no indication he was a threat to their safety and without probable cause, is contrary to the great weight of the evidence. Lyle Dotson is entitled to a new trial against these two Defendants on this claim.

### 2.  Unreasonable Arrest (Defendant McCartney)

The Court's instructions explained:

> Battery defined in La. R.S. 14:33 requires the (1) **intentional**, (2) **unjustified,** (3) use of force or violence, (4) on another person.  A battery on a police officer requires (1) a battery (as defined above) without consent (2) "when the offender has reasonable grounds to believe the victim is a police officer acting in the performance of his duty."[100]

The great weight of the evidence at trial proved that any contact between Lyle Dotson's leg and any part of Defendant McCartney's body was both unintentional and justified.

---

[98] ECF No. 169 at 6 ¶ 36.
[99] ECF No. 169 at 6-7 ¶¶ 36-38. See United States v. Jordan, 232 F.3d 447, 450 (5th Cir. 2000), citing United States v. Sanders, 994 F.2d 200, 206 (5th Cir. 1993); Bennett v. City of Eastpointe, 410 F.3d 810, 836 (6th Cir. 2005).
[100] ECF No. 169 at 8 ¶ 50 (emphasis added); La. R.S. 14:33.

First, any such contact was unintentional. When he returned to the location where Defendants Anderson and Journee were holding Lyle Dotson, Defendant McCartney indicated to Anderson that he was going to cut Lyle loose.[101] At that point, the only reason that Lyle Dotson was still physically detained and in handcuffs was to get a photograph.[102] Defendant McCartney attempted to take Lyle Dotson's picture with McCartney's personal cellphone.[103]

Lyle Dotson stated that he did not want his photo taken.[104] Up until that point, other than "saying rude things," Lyle Dotson was not resisting; in fact, he was cooperative.[105] Dotson was bending at the waist, maybe turning his head so his picture couldn't be taken; but he wasn't actively resisting Defendants Anderson and Journee.[106] Defendant Journee did not see contact between Lyle Dotson and Defendant McCartney.[107] In particular, Journee did not see Dotson kick McCartney.[108] Defendant Journee did not hear Defendant McCartney say "ouch" or otherwise exclaim that he had been kicked.[109] On Toulouse Street, Journee did not even know the charge on which Lyle was arrested.[110]

Defendant Anderson testified that while Defendant McCartney was attempting to take Lyle Dotson's photo, Lyle "was trying to keep from taking the photo and dropping his head and – dropping it down and kicking his feet."[111] That was the point at which, according to his testimony,

---

[101] Tr. 417:19-418:1.
[102] Tr. 418:2-24.
[103] Tr. 419:6-9.
[104] Tr. 419:10-11.
[105] Tr. 419:12-420:2.
[106] Tr. 389:7-10, 14-24.
[107] Tr. 390:10-12.
[108] Tr. 390:6-9, 22-23.
[109] Tr. 390:24-391:1.
[110] Tr. 391:14-392:3.
[111] Tr. 421:3-7.

Defendant Anderson saw contact between Lyle Dotson's foot and Defendant McCartney's leg.[112]
But Anderson testified twice that any such contact was unintentional:

> I mean, the way he was moving around, jerking and kicking his legs trying to keep – it's possible it was unintentional, but he was kicking his leg out. It's possible it was unintentional. [113]

> Well, you only asked me what contact did I see him make, and the only contact I saw Lyle make with Trooper McCartney is when he had bouncing -- doing all the kicking. And like I told you, I didn't think it was intentional when he kicked him on his leg.[114]

Second, any such contact was justified. As discussed in the section above regarding the inconsistent jury verdict, Lyle Dotson had a right to resist his continued detention for purposes of taking his photograph, as that detention constituted an unreasonable seizure and arrest.[115]

Thus, even if the Court does not order a new trial on grounds of the irreconcilably inconsistent answers to the jury interrogatories 7 and 11 as requested in Section III.B above, it should do so on the basis that the jury's verdict as to Question 11 is against the great weight of the evidence.

### 3. Unreasonable Arrest (Defendants Anderson and Journee)

The Court instructed the jury that "[a] non-arresting officer may be liable for false arrest where the non-arresting officer has knowledge that the arrest is made without probable cause, has a reasonable opportunity to prevent the harm, and chooses not to act."[116] The Eleventh Circuit

---

[112] Tr. 421:7-9.
[113] Tr. 422: 7-10.
[114] Tr. 423:7-11.
[115] A civilian has the right to use "such force as is necessary" to resist his unlawful arrest. City of Monroe v. Goldston, No. 95-0315 (La. 9/29/95), 661 So. 2d 428, 430 (arrestee "struggled with several officers and an attacking police dog, and his response in lashing out at [the officer] and fortuitously hitting him with the ring he was wearing did not exceed the scope of that necessary force"), citing City of New Orleans v. Lyons, 342 So. 2d 196 (La. 1977). See also Harger v. City of West Monroe, No. 14-976, 2015 WL 5518979 at *13 (W.D. La. Sept. 17, 2015) ("It is a long-established principle in Louisiana law that a citizen has the right to resist an unlawful arrest"). Similarly, Louisiana law creates a right to resist an unlawful detention. La. R.S. 14:108; State v. Manuel, 2006-0486 (La. App. 4 Cir. 11/21/06), 946 So.2d 245, writ denied, 2006-2981 (La. 9/14/07), 963 So.2d 994.
[116] ECF No. 169 at 8 ¶ 52. See also ECF 150 at 15; Whitely v. Hanna, 725 F. 3d 631, 646-647 (5th Cir. 2013).

characterizes this "failure to intervene" doctrine in terms of the non-arresting officers' participation in the arrest itself.[117] Fifth Circuit cases support this proposition as well.[118]

The great weight of the evidence at trial proved that Defendants Anderson and Journee are legally responsible, along with Defendant McCartney, for Lyle Dotson's unconstitutional arrest for battery on an officer.

At the point when Defendant McCartney told Lyle Dotson that he wanted his photograph, Defendants Journee and Anderson were standing on either side of, and in close proximity to Lyle,[119] who was still in handcuffs. Defendants Anderson, Journee, and McCartney "were all within a few feet of each other."[120] Defendant Anderson testified that he was right alongside Lyle, holding Lyle's arm, while McCartney attempted the photograph; Defendant Journee, according to Anderson, was on the other side of Lyle.[121] Anderson told the jury, "[w]e was standing there holding his arm."[122] "This is all while – while [Dotson] was doing all this ducking and kicking and trying to keep [McCartney] from taking his picture."[123] Defendant Anderson specifically testified that "we're still trying to hold [Dotson]" when Defendant McCartney claimed to have been kicked in the hand.[124] Defendant McCartney also testified that, while he was attempting to take Lyle Dotson's picture, Defendants Anderson and Journee "were maintaining, you know, contact with his arms."[125]

---

[117] Thus, in <u>Wilkerson v. Seymour</u>, 736 F.3d 974, 979-80 (11th Cir. 2013) the Eleventh Circuit interpreted <u>Jones v. Cannon</u>, 174 F.3d 1271, 1283-84 (11th Cir. 1999) as standing for the proposition that, "where an officer was present during an arrest and knew that the arresting officer had no reasonable basis for arguable probable cause, the non-arresting officer could be liable under § 1983 if he was sufficiently involved in the arrest."
[118] <u>Melear v. Spears</u>, 862 F.2d 1177, 1186 (5th Cir. 1989); <u>see also</u> <u>James by James v. Sadler</u>, 909 F.2d 834, 837 (5th Cir. 1990)
[119] Tr. 388:9-23.
[120] Tr. 388:24-389:2.
[121] Tr. 420:3-21.
[122] Tr. 420:21.
[123] Tr. 421:15-18.
[124] Tr. 421:19-23.
[125] Tr. 461:12-18.

Defendants Anderson and Journee therefore had knowledge that Lyle's arrest was made without probable cause. They had a reasonable opportunity to prevent the harm, and chose not to act. Indeed, Defendant Anderson admitted that he saw Defendant McCartney's arrest report before it was finalized.[126]  He could have stopped the arrest at the station.

Because the great weight of the evidence proved that Defendants Anderson and Journee failed to intervene to stop the false arrest of Lyle Dotson by Defendant McCartney, this Court should grant Dotson a new trial against these defendants on that claim.

### IV. Conclusion

For the reasons stated above, Plaintiff requests the court grant his motion, and order a new trial on some or all of the issues set forth above.

Respectfully Submitted,

*/s/James Craig*

James Craig, LSBN # 33687
Emily Washington, LSBN # 34143
Roderick & Solange MacArthur Justice Center
4400 S. Carrolton Ave., New Orleans, LA 70119
Tel. 504-620-2259

- AND -

_____
Elizabeth Cumming, LSBN #31685
1040 St. Ferdinand St., New Orleans, LA 70117
Tel. 504-291-6990
Fax. 504-291-6994
Elizabeth.cumming@ecumminglaw.com

*Attorneys for Plaintiffs*

---

[126] Tr. 427:3-12.

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2018, I served the foregoing on all counsel of record via the court's Case Management / Electronic Case Files (CM /ECF) system.

*<u>/s/ James Craig</u>*